875 So.2d 415 (2004)
Grover REED, Appellant,
v.
STATE of Florida, Appellee.
Grover Reed, Petitioner,
v.
James V. Crosby, Jr., etc., Respondent.
Nos. SC02-2191, SC03-558.
Supreme Court of Florida.
April 15, 2004.
Rehearing Denied June 3, 2004.
*418 Christopher J. Anderson, Atlantic Beach, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, and Charmaine M. Millsaps, Assistant Attorney General, Tallahassee, FL, for Appellee/Respondent.
PER CURIAM.
Grover Reed appeals an order of the circuit court denying a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850 and petitions the Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons that follow, we affirm the circuit court's order and deny the petition.

BACKGROUND
On direct appeal, this Court summarized the underlying facts of Reed's crimes as follows:
In December of 1985 Reed, accompanied by his woman friend and two young children, arrived in Jacksonville homeless and destitute. Through Traveler's Aid they were given shelter in the home of the Reverend Ervin Oermann, a Lutheran *419 minister. They stayed with Reverend Oermann and his wife, Betty, for just over a week but were asked to leave when Reverend Oermann discovered that Reed had drug paraphernalia. However, Reed continued to receive aid from the Oermanns in the form of money and transportation. Eventually the Oermanns began to feel they were being used and withdrew all support. Reed resented the discontinuance of aid and vowed to get even.
On February 27, 1986, Reverend Oermann returned home from a night class and found his wife, Betty, dead on the living room floor. An autopsy showed she had been strangled, raped, and stabbed repeatedly in the throat. Found in the house was a distinctive baseball cap. For some time this cap was the only lead police had, so they produced a television recreation of the crime and showed the cap. One viewer recognized the cap as being much like one Reed wore. Further investigation revealed that Reed was last seen wearing his cap on the day Mrs. Oermann was killed. Ultimately, he was arrested.
The most significant evidence of Reed's guilt may be summarized as follows:
(a) Witnesses said they had seen Reed wearing his baseball cap on the day of the murder before the probable time of death but not thereafter. They positively identified the cap as Reed's because of the presence of certain stains and mildew.
(b) Reed's fingerprints were found on checks that had been taken from the Oermann home and had been found in the yard.
(c) An expert witness gave testimony that hairs found on the body and in the baseball cap were consistent with Reed's hair.
(d) Another expert witness gave testimony that the semen found in the body could have been Reed's.
(e) Reed's cellmate, Nigel Hackshaw, gave testimony that Reed had admitted breaking into the Oermann house and killing Mrs. Oermann.
The jury found Reed guilty [of first-degree murder, sexual battery, and robbery]. Neither side presented additional evidence in the penalty phase. After hearing arguments by counsel, the jury recommended death by an eleven-to-one vote. The judge delayed sentencing in order that a presentence investigation could be completed. After receiving the PSI and after considering additional mitigating evidence presented by Reed, the trial judge sentenced him to death. The judge found six aggravating factors [n.] and nothing in mitigation.
[n.] They were: (1) The defendant was previously convicted of other felonies involving the use or threat of violence to the person. (2) The capital felony was committed while the defendant was engaged in the commission of sexual battery. (3) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest. (4) The capital felony was committed for pecuniary gain. (5) The capital felony was especially heinous, atrocious, or cruel. (6) The capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.
Reed v. State, 560 So.2d 203, 204-05 (Fla. 1990). On direct appeal, this Court affirmed Reed's convictions and death sentence, striking two aggravating circumstances, cold, calculated, and premeditated (CCP) and prior violent felony convictions, but holding that the elimination of those aggravating circumstances would not have *420 affected Reed's sentence because there remained four aggravating circumstances balanced against a total absence of mitigating circumstances. Id. at 207.
In 1992, Reed filed a Florida Rule of Criminal Procedure 3.850 motion for postconviction relief, which the circuit court summarily denied. On appeal, this Court remanded for the circuit court to hold an evidentiary hearing on Reed's ineffective assistance of counsel claims[1] and affirmed the denial of all other claims. See Reed v. State, 640 So.2d 1094 (Fla.1994). Thereafter, various administrative and practical matters appear to have delayed the proceedings. However, in 1996, Reed filed an amended motion, the State responded, and the circuit court eventually held a Huff[2] hearing in August 2001 and an evidentiary hearing on February 19-22, 2002. After the Huff hearing, the circuit court summarily denied four of Reed's ineffective assistance claims[3] and denied all other claims after the evidentiary hearing.[4] Reed now appeals the circuit court's denial of twelve of his postconviction claims and petitions this Court for a writ of habeas corpus.

RULE 3.850 APPEAL
Reed's first claim is that the circuit court erred in summarily denying his claim of ineffective assistance regarding his trial counsel's failure to object to peremptory strikes of several African-American jurors by the State. As this Court noted on direct appeal:
During the course of voir dire, the prosecutor used eight of his ten peremptory strikes to excuse blacks from the jury. After both sides had expended their peremptories, defense counsel moved for a mistrial pursuant to State v. Neil, 457 So.2d 481 (Fla.1984). At this point, Mr. Bateh, the prosecutor, asked to explain his reasons for striking the jurors. The court stated:
Anyway, I'm well aware if the court determines that there's a prima facie showing of exclusion of jurors on a racial basis that it requires the State to make some showing to the court as *421 to why they excluded them for other than racial basis, which Mr. Bateh is volunteering to do without me making a finding is what I understand you're saying.
After listening to the prosecutor's explanation for striking the black jurors, the following discussion ensued:
THE COURT: All right. The state, of course, has submitted to a voluntary Neil inquiry, in essence, in this regard without the Court making an initial determination that it was necessary. The two observations and I don't have the statistics in front of me, butand I'm not basing this decision on statistics, but I think we're all aware that somewhere in the neighborhood of 25 percent of the population of the registration in Duval County is black. I'm not sure those are accurate, but I think it's in that neighborhood. The composition of this jury right now, the present composition of the 12 jurors, there's two, which makes 16 and two-thirds of the jury is black of the 12. There's no blacks as far as alternates are concerned. Might I assume the victim in the case is white?
MR. BATEH: That's correct, Your Honor.
MR. NICHOLS: Yes, sir.
THE COURT: The defendant is white. I don't question his standing to raise the question. There is a standing to raise the question, but taking the representations of Mr. Bateh, I find that the challenges exercised against the blacks are not based purely upon race or racial discrimination and, consequently, I will deny any motion for a mistrial or more properly, probably, a motion to strike the entire panel, but, at any rate, I deny the motion on that basis.
Reed, 560 So.2d at 205. Reed argues that, after the prosecutor gave nonracially prejudicial reasons for the strikes, his trial counsel rendered deficient performance by not following up and pointing out that the prosecutor's reasons were illogical. However, it is clear from the above summary of these proceedings that trial counsel objected to the strikes, and the trial court took the objection into consideration. Although Reed alleges his counsel did not make a strong enough argument that the jurors were challenged because of their race, the trial court apparently assumed arguendo that that a prima facie showing had been made and nonetheless found the prosecutor's reasons sufficient. Furthermore, Reed raised the issue on direct appeal, arguing the prosecutor's reasons did not meet the race-neutral test mandated in Neil. Reed's brief to this Court challenged the validity of each of the specific reasons given by the prosecutor, and this Court found the trial court did not abuse its discretion in denying Reed's motion for mistrial. Thus, this issue has been litigated and was properly found to be procedurally barred, "even if couched in ineffective assistance language." Johnson v. Singletary, 695 So.2d 263, 265 (Fla.1996).
Reed's second claim is that the circuit court erred in finding no ineffective assistance of counsel regarding his trial counsel's failure to retain a hair expert. With regard to this and all other ineffective assistance claims, the test to be applied by the circuit court is two-pronged: the defendant must show both that trial counsel's performance was deficient and that the defendant was prejudiced by the deficiency. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Additionally, this Court's standard of review is two-pronged: (1) this Court must defer to the circuit court's findings on factual issues so long as competent, *422 substantial evidence supports them; but (2) must review de novo ultimate conclusions on the deficiency and prejudice prongs. See Stephens v. State, 748 So.2d 1028, 1033 (Fla.1999) ("Thus, under Strickland, both the performance and prejudice prongs are mixed questions of law and fact, with deference to be given only to the lower court's factual findings.").
The victim was murdered approximately two months after the period when Reed lived in the victim's home. After her murder, hair evidence was collected from a baseball cap found near the body and in "sweepings" from the victim's clothing and pubic hair. At trial, the State presented a hair expert, who testified the baseball cap hairs and one hair obtained from the clothing were microscopically the same as Reed's head hair sample and that one of the loose hairs found among the victim's pubic hair was microscopically the same as Reed's pubic hair sample. At the evidentiary hearing below, Reed introduced the testimony of Dr. Dale Nute for the purpose of showing how a hair expert could have suggested cross-examination questions revealing the comparatively low reliability of hair comparisons and provided information regarding alternative means of hair transference.
In rejecting many of Reed's ineffectiveness claims, the circuit court noted generally that Reed's trial counsel, Richard Nichols, was and remains an experienced defense attorney, well known to the Bar in the Fourth Circuit, who by the time he represented Reed, had been involved in fifteen to twenty prior murder cases both as an assistant state attorney and a criminal defense attorney. The circuit court found Nichols' testimony at the evidentiary hearing to be credible and to reveal sound tactical and ethical decisions devolved from his conclusion that Reed effectively had admitted that he was in fact responsible for the rape and murder of the victim.[5] With specific regard to the failure to retain a hair expert, the circuit court found Reed had "failed to offer anything to indicate that there was anything incorrect about the state's hair evidence at the trial or that there was anything detrimental about the manner in which it was presented." State v. Reed, No. 86-6123-CF at 7 (Fla. 4th Cir. Ct. order filed Aug. 26, 2002) (postconviction order). Furthermore, the court concluded that Nute's testimony "failed to offer anything about hair, shedding hair, or the transference of shedding hairs that would not already be known by an experienced criminal defense lawyer." Id. at 8. Finally, the court noted that the presence of hair consistent with Reed's hair in the baseball cap was less significant than the positive identification of Reed's cap itself and testimony that it was last seen in his possession on the day of the murder.
Essentially, the circuit court found: (1) that there was no deficient performance, because trial counsel had a reason to believe that efforts to test the State's hair evidence would be fruitless; and (2) that there was no prejudice, because the employment of a hair expert would not have assisted the defense. We find no error in *423 these conclusions. Nute testified that if he had been employed by trial counsel, he would have advised the defense to have reexamined the single most critical piece of hair evidence, the pubic hair. However, given Reed's incriminating statements, trial counsel could not be found deficient under the standards of Strickland for not having the hair reexamined. See Gudinas v. State, 816 So.2d 1095, 1101-02 (Fla.2002) (finding no ineffective assistance in not pursuing DNA testing in light of incriminating statements by Gudinas to his attorneys and other inculpating physical evidence). Nute also testified that he could have provided a "not very probable but... plausible way" the pubic hair could have been transferred without being involved in a rape. The circuit court clearly found this testimony insufficient to establish the prejudice prong of Strickland, and we agree. Finally, regarding the head hairs, Nute testified a hair expert could have suggested some possible scenarios to explain their presence because "hairs are so easily shed, particularly head hairs, and they are so easily transferred and picked up by other items of clothing that it'syou can always come up with a possible scenario." However, the fact that hairs shed and are easily transferred is within the average person's realm of knowledge. We find no error in the conclusion that trial counsel did not provide deficient performance by failing to retain an expert to explain to him a fact commonly known. Therefore, we affirm the denial of this claim.[6]
Reed's third claim is that the circuit court erred in finding no ineffective assistance regarding his trial counsel's failure to retain a serology expert and failure to challenge the State's blood-type evidence. At trial, the State presented the testimony of Paul Doleman, a crime lab analyst specializing in forensic serology. Doleman testified that at that time forensic serology could not produce positive identification but, rather, could only include or exclude an individual as part of a certain percentage of the population that could have contributed a particular body fluid. Doleman then testified that the victim was type O secretor and that Reed was type O nonsecretor. He explained a secretor "is an individual who will demonstrate their blood type ... in their body fluids other than blood," while a nonsecretor "is an individual who does not demonstrate their blood type ... in their other body fluids other than blood." Doleman tested the vaginal swab taken from the victim and found that it contained semen. He also detected antigenic activity "consistent with or ... equivalent to blood type O." Doleman then stated:
Having determined the blood type and the secretor status of Betty Oermann and having determined the blood type and the secretor status of Grover Reed and having determined that H antigenic activity was present on the vaginal swab, *424 the seminal fluid and spermatozoa were present on the vaginal swab, I am able to make a determination that Grover Reed falls into the population, the male population, that could have had intercourse with Betty Oermann.
During cross-examination, Reed's trial counsel elicited further testimony that, given the victim's blood type and the results of the testing, the percentage of the male population that could have been the source of the semen was approximately fifty-six to fifty-seven percent.
Although neither the State nor trial counsel asked Doleman to elaborate further on how he reached the conclusion that Reed could have been the source, the conclusion is not illogical. The implicit reasoning is that when a vaginal swab from a woman who is known to be type O secretor is tested and that swab is found to contain semen as well as vaginal fluid, the discovery of type O secretor alone indicates one of two possible scenarios: (1) that both the vaginal fluid and the semen came from type O secretors; or (2) that the vaginal fluid came from a type O secretor and the semen came from a nonsecretor of any blood type. In other words, testing in this case indicated that the semen could have derived from a type O secretor or any type nonsecretor. Therefore, Reed, a nonsecretor, fell within the male population from which the semen could have derived. Unfortunately, because neither side asked Doleman to further explain how he reached his conclusion, his testimony could have been interpreted as inconsistent. This is illustrated by a note sent to the judge from a juror prior to jury instructions, which read in part:
[T]he witness said that he had examined the sperm in question, and that the blood type obtained from it was the same as that of Grover Reed.
... [A]s I understand it, [Reed's] blood type can not be obtained from his saliva or sperm.
What I would like to know is whether or not his testimony is consistent to the fact that the sperm could and did contain Grover Reed's blood type.
Due to juror confusion, the judge permitted the court reporter to re-read to the jury Doleman's testimony on direct and cross-examination.
Reed here argues that his trial counsel should have used the information that Reed was a nonsecretor to challenge Doleman's conclusion and would have been properly advised to do so if he had hired a blood-type expert. Reed again relied on Nute at the evidentiary hearing to support this claim. Nute testified that if he had been retained, he would have advised trial counsel regarding blood groups, the concept of secretor versus nonsecretor status, and "how to ask the questions involved in that." Specifically, Nute testified:
[S]ince there is no test to determine whether thein a mixture whether [the antigen activity] came from the semen or from the vaginal secretion that you can't automatically assume since you know that the vaginal secretions have antigens in them, since she was a secretor, you can't automatically assume, well, the semen doesn't. The semen also could have it and if there are a couple scenarios, that depending on how much the mixture there were between the semen and the vaginal secretion ... that it was likely that the semen could have come from a person, an O person who had the antigen present in their semen which would have increased the number of people who could have done it considerably but it would have also excluded Mr. Reed since he was a nonsecretor and since you couldn't tell whether the semen itself was afrom a *425 nonsecretor or not that point should have been brought out very strongly in the trial.
Nute summarized his point by stating that the testing could not have indicated whether the semen came from a nonsecretor or secretor and therefore could neither include nor exclude Reed as the source of the semen. However, when asked whether "the only true thing" that could be said about the blood-type evidence was "that the defendant could have been in that majority of all American males, 56 percent that could have contributed the semen," Nute answered that that was correct. And, on cross-examination, Nute acknowledged the correctness of Doleman's finding that Reed fell within the fifty-six to fifty-seven percent of the male population that could have had intercourse with the victim.
According to trial counsel's testimony at the evidentiary hearing, the strategy with regard to the State's blood-type evidence was to show that it could not specifically identify the source and could only place someone in a large group. When asked if he felt relatively well versed in the science of ABO blood typing at that time, trial counsel stated it was a "pretty simple proposition" and that he had had many prior cases involving blood testimony.
While Reed contends that his trial counsel should have further challenged this testimony, we find that the circuit court did not err in concluding that trial counsel's consultation with an independent serologist would not have changed the statistical numbers in any way. As explained above, Doleman's final conclusion that the discovery of type O secretor alone in the vaginal swab indicated that the semen could have derived from a type O secretor or any type nonsecretor was not illogical. Given Nute's own admission that Doleman correctly concluded Reed "could have been in that majority of all American males, 56 percent that could have contributed the semen," we find no error in the conclusion that trial counsel's failure to question the manner in which Doleman reached that percentage was not deficient performance. Rather, it appears that trial counsel took the most appropriate approach by eliciting Doleman's further testimony that a very high percentage, fifty-six to fifty-seven percent, of all males could have contributed the semen. Therefore, we find no error in the denial of this claim.
Reed's fourth claim is that the circuit court erred in finding no ineffective assistance regarding his trial counsel's failure to retain a fingerprint expert. Trial testimony indicated that the victim kept personal checks in her wallet, after the crime some of her checks were found on the ground in her backyard, and her wallet was found in a canal near her house. The State presented the testimony of Bruce Scott, a former Florida Department of Law Enforcement (FDLE) latent fingerprint examiner, who tested the checks for fingerprints and found one print of value. Scott's comparison of that print to Reed's known fingerprints resulted in a positive identification.
Scott testified that he developed the latent print through a chemical application of ninhydrin acetone solution that causes latent prints to become visible through a chemical color reaction. He stated that a latent print will turn a light pink to an extremely dark purple when the solution is applied and that the colors "usually have an indication of strength ... meaning the concentration of the latent print, whether the person was perspiring heavily or whether the person would handle it normally and also how long the print possibly might have been on that check." He described the print on the victim's check as producing an "extremely strong, quick reaction, which yielded a dark purple color." *426 When asked what was significant about that fact, Scott stated:
Well, I'm certainly not capable of dating fingerprints, which means that this latent was made a week ago or this was three hours ago or whatever, but after looking at hundreds of thousands of reactions and looking at latent fingerprints, I made an opinion at that time, I was working it on March 4, 1986, that it was aI termed it a fresh print or a print that, because of the dark purple reaction, because of how the chemical reaction occurred, you're dealing with a print that'sI've never seen one react like that older than ten days.
When asked if there was any other significance, Scott stated, "I felt the individual at the time the latent was made was probably perspiring heavily." At that point, trial counsel objected:
Your Honor, I'm going to move to have [the testimony] stricken as being outside the field of his expertise. He's been qualified as a person to make a fingerprint latent comparison analysis to say whether or not a print came from the same person. Frankly I have never heard someone qualified in this area to be able
At that point, the judge overruled the objection "subject to any cross-examination as to whether or not he can do something." When the prosecutor continued this line of questioning, trial counsel asked that the record reflect his objection to the testimony as being outside of the field of the witness's expertise and "not a matter of cross-examination, but a matter of admissibility, that there's no voir dire."
On cross-examination, trial counsel asked Scott if he had a degree in chemistry, physics, medicine, or pathology. When the State objected, trial counsel stated that his purpose was to show that any testimony regarding "what rate somebody is sweating" was beyond Scott's expertise. Trial counsel then intensely cross-examined Scott regarding environmental conditions that affect the rate at which a fingerprint deteriorates. Scott's answers were generally unresponsivea fact acknowledged on the record by the trial judge. But Scott conceded that testing cannot determine on what date a print was left and that he was unaware of the environmental conditions in which the check was kept between its discovery and the testing of it. Trial counsel also elicited Scott's acknowledgment that people perspire at different rates and that Scott did not test Reed to determine whether he perspires more or less than the average person.
Reed here claims that his counsel was deficient for not obtaining the assistance and testimony of a defense fingerprint expert to challenge Scott's testimony. At the evidentiary hearing, Reed presented the testimony of Ronald Fertgus, a forensic consultant and former latent print examiner. Fertgus disagreed with Scott's testimony that a ninhydrin reaction reveals the print strength, the perspiration rate of the donor, or the length of time the print had been on the item. He testified that there is currently no way to date a fingerprint, citing professional publications for support. He also stated that there is no data to support the claim that one can determine a person was perspiring heavily when a print was left because "[n]inhydrin works on trace amounts of amino acids so it doesn't matter if you sweat a lot or sweat a little." Fertgus could not testify, however, that Scott's identification of the latent print as matching Reed's fingerprint was erroneous because Fertgus was never asked to perform a comparison himself.
In response, the State presented the testimony of Alan Chipperfield, Reed's first counsel, who had turned the case over *427 to Nichols during pretrial when a conflict developed with the public defenders' office. Chipperfield testified that he observed part of Reed's trial and was very surprised by Scott's testimony regarding the freshness of the print because it was his understanding that freshness could only be determined from surrounding circumstances, not from the print itself. As for Nichols, he stated at the evidentiary hearing that based on past trial experience, he had a fair understanding of latent fingerprint comparisons at the time of Reed's trial. He further testified that during the preparation of Reed's case, there was no reason to question Scott's fingerprint identification, he was aware it was FDLE policy to have a superior examiner review and verify fingerprint identifications, and his strategy was to minimize the fingerprint's importance by showing that Reed previously lived in the victim's house. Specifically, regarding Scott's testimony that the fingerprint was fresh, Nichols stated that he could not have foreseen the testimony because he had "never heard of anybody even speculating that a print could be dated." But he also recalled feeling that the jury understood after his cross-examination that Scott's statements on that point "appeared to be preposterous."
In denying this claim, the circuit court noted that Reed failed to produce any testimony indicating that the identification of the fingerprint was erroneous and that it was well known to Nichols that fingerprints cannot be dated, as evidenced by his objection and cross-examination. Further, the court wrote, "it was obvious to the jury that the fingerprint was fresh as it was found on a check to which the defendant had no access, in a wallet to which the defendant had no access, which had been inside the residence prior to the rape and murder of the victim, and which was found laying in the backyard by investigating officers." Postconviction order at 10.
The circuit court correctly noted that Reed failed to present evidence indicating that Scott's identification of the print was in error. Rather, Reed's claim focuses entirely on Scott's testimony that the print was fresh and left by someone who was heavily perspiring. He asserts that his trial counsel was ineffective for failing to retain a defense fingerprint expert who could have countered those claims. However, substantial evidence in the form of testimony by Chipperfield, Nichols, and even Ronald Fertgus supports the conclusion that Nichols could not have foreseen the presentation of that particular testimony. Counsel cannot be found ineffective for failing to arm himself with a defense expert to counter testimony that was unforeseeable. And to the extent that Reed might be claiming that his counsel should have retained an expert after Scott's testimony, such action appears to have been unnecessary. Nichols rigorously cross-examined Scott, eliciting his acknowledgment that a fingerprint cannot be "dated," environmental conditions can affect a fingerprint, he did not consider environmental conditions when he concluded that the fingerprint was "fresh," and he did not factor in the varying rates of human perspiration. As Nichols testified, the point was made to the jury that Scott's testimony was "preposterous." The jury's guilty verdict does not contradict this because, as the circuit court noted, other circumstances beyond the ninhydrin reaction effectively "dated" the fingerprint. Furthermore, Reed's assertion that his counsel was ineffective for not requesting a motion for mistrial based on a Frye violation[7] is undermined by the fact that his counsel did so object, stating that the objection was "a matter of admissibility, *428 that there's no voir direI mean there's no predicate laid to show that he has the expertise to render this kind of opinion." Therefore, we affirm the denial of this claim.
Reed's fifth claim is that the circuit court erred in finding no ineffective assistance regarding his trial counsel's failure to present an alibi defense. At trial, the victim's husband testified that he left his wife at home at around 5:40 p.m. and found her murdered when he returned home at 9:50 p.m. Witness Mike Shelburne testified that he played a game of "quarters" with Reed in the morning at the trailer park where they both lived and later in the day went with him to the grocery store and a friend's house. When they left the friend's house at "around lunch," the car they were in broke down on Ricker Road. Shelburne decided to walk home, left Reed with the car, and did not see him again until Reed woke him at home after dark. Witness Debra Hipp testified she visited Reed's girlfriend, Chris Niznik, at around 12:45 p.m. and agreed to lend her car to Reed if he returned it by 1:30 p.m. because she needed it then. He did not return the car, and she spent the day at the trailer park anxiously waiting for his return. Between 7:30 and 8 p.m., she finally saw Reed return on foot, running between the trailers and glancing around. He gave her the car keys, did not explain the missing car, and went into his trailer without turning on the lights. Meanwhile, Hipp's husband had been out looking for the car and returned around 8:15 or 8:30 p.m. Witness Lisa Smith, Reed's neighbor, corroborated Hipp's testimony, testifying she waited with Hipp and Niznik for Reed's return and saw Reed return home between 7:30 and 8 p.m., jogging through the trailer park and acting "scared" and "nervous." Finally, Detective Warren testified that the distance between the location where the car broke down and the trailer park was 5.1 miles, the distance between the trailer park and the victim's home was 1.2 miles, and the straightest route from where the car broke down to the victim's home would lead past the trailer park.
Reed presented no witnesses at trial and filed a handwritten waiver form indicating that he maintained his innocence, was never near the victim's home on the day of her murder, was not with anyone between the time Shelburne left him with the car and the time he returned home, and because he believed "no witness could establish [an] alibi," had instructed his counsel to call no witnesses in order to reserve the right to present first and last closing arguments. However, Reed now claims that his counsel should have presented alibi testimony from Mark Rainey, Chris Niznik, and Officer Summersill. These witnesses testified to the following at the evidentiary hearing. First, Mark Rainey testified that he joined Patrick Hipp in the search for Debra Hipp's missing car. They found it, towed it back to the trailer park, did not see Reed at that time, and sat at Hipp's trailer "for a while" before they saw Reed "fighting with a guy named Lee." It was dark both when they returned to the trailer park and when he saw Reed. Second, Niznik testified that Reed played cards with Shelburne in the late morning or early afternoon and then borrowed Hipp's car to go to the grocery store with Shelburne at around 1 p.m. Hours went by, and she became angry with him as she waited with Hipp and Smith. At some point, Smith called the police, who arrived but said they could do nothing. When asked what happened next, Niznik testified: "Then it was like starting to get dark and then he came back and it just got dark when he came back." From that time on, he was with her. Smith later called the police a second time because Reed and Lee *429 got into a fight. Third, Officer Summersill testified regarding a computer printout from the Jacksonville Sheriff's Office that indicated a call was received from lot 50 of Reed's trailer park at 6:41 p.m., an officer arrived at 6:57 and left at 7:43, the incident was a disturbance of the peace, and the complainant was a Mrs. Stanford. The printout also indicated that a second call was received from Reed's lot, lot 52, at 9:12 p.m., an officer arrived at 9:21 and left at 9:32, the incident was another disturbance of the peace, and the complainant's name was Lisa Smith. Officer Summersill further testified that on the day of the murder he was dispatched to a location on Ricker Road and encountered Reed, who had been drinking and was in the back seat of a vehicle. His report of the incident noted Reed's clothing but made no mention of the unique baseball cap and indicated this contact was at 4 p.m. He estimated that to travel from the location where he encountered Reed to Reed's trailer park would take forty-five minutes to an hour by foot and five to ten minutes by car; it was another mile from there to the murder site.
Reed's first counsel, Chipperfield, testified at the evidentiary hearing that he investigated an alibi defense, including determining distances and the time of sunset. He obtained a record indicating the sun set at 6:24 p.m. on the day of the murder, indicated in notes that he needed to "nail down" the alibi defense with depositions of Rainey, Hipp, Niznik, and Lee, and filed a notice of alibi. He requested that the police preserve tapes of calls on the day of the murder but received a letter stating that those tapes already had been reused. Finally, although he did not recall meeting with trial counsel, he testified that it was his practice to talk with or even give a written summary to new counsel when a file was transferred.
Nichols testified at the evidentiary hearing that as he understood the available testimony, "if you took that evidence in its best light it still left enough time relative to the fairly small distances that Mr. Reed ... could have committed the crime." He discussed an alibi defense with Reed, and Reed acknowledged it would be a fruitless endeavor. Nichols stated that although he believed his obligation would be "to hold the state's feet to the fire and make sure the evidence is legally gathered and legally presented and legally sufficient," even where his client had admitted guilt to him, the presentation of an alibi witness in such circumstances would be suborning perjury, and he would withdraw from the case if the client pressed him to present it.
In denying this claim, the circuit court concluded that Reed failed to demonstrate that his trial counsel rendered deficient performance. The court held that trial counsel made a tactical and ethical decision to not attempt to establish an alibi defense because the available testimony provided, at best, an incomplete alibi. We find no error in that conclusion. Reed's own waiver form and trial counsel's testimony at the evidentiary hearing provided competent, substantial evidence that they discussed the presentation of an alibi defense, determined that the defense was incomplete, and chose instead to reserve the right to present first and last closing arguments. The record supports the circuit court's conclusion that this was an informed tactical decision, given the available witnesses and their testimony at the evidentiary hearing. Specifically, Officer Summersill's testimony placed Reed on Ricker Road at 4 p.m. Rainey's testimony did not place Reed at the trailer park until after dark. And Niznik's testimony placed Reed at the trailer park just after dark. The sun set at 6:24 p.m. Thus, taking the testimony in *430 the light most favorable to Reed, he still had approximately 2.5 hours to travel from Ricker Road to the victim's home, commit the murder, and return to the trailer park. Officer Summersill stated it would take forty-five minutes to an hour to travel by foot the distance from Ricker Road to the trailer park. Presumably, it would take much less time to travel from there to the victim's home and back, given the shorter distance between those locations. These facts support the circuit court's conclusion that Reed's alibi was, at best, incomplete as he had sufficient time to commit the murder, especially given Hipp and Smith's trial testimony that Reed returned running or jogging. Furthermore, the fact that Summersill's report did not list the unique baseball cap in Reed's description would have contributed little in the face of other testimony indicating that Reed put on his "lucky hat" while playing cards with Shelburne earlier in the day and was never seen wearing it again after that day. In fact, as the circuit court correctly noted, the entire encounter with Summersill would have discredited Reed's prior statements to police that he was at home the entire day. Given the relatively low probative value of this testimony, we cannot find error in the conclusion that trial counsel's decision to reserve first and last closing arguments and avoid the presentation of potentially perjurious testimony was not deficient performance.
Reed's sixth claim is that the circuit court erred in finding no Brady[8] violation regarding a criminal investigation of Bruce Scott, the State's fingerprint expert. In Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), the United States Supreme Court enunciated the three components of a true Brady violation as follows: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." Under the prejudice prong, the defendant must show that the suppressed evidence is material. See id. at 282, 119 S.Ct. 1936. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Way v. State, 760 So.2d 903, 913 (Fla.2000) (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)).
Steven Platt, Bureau Chief at FDLE at the time of Reed's case, testified at the evidentiary hearing that Scott confessed to him in June of 1986 that he had been consuming cocaine powder residue from evidence bags in the crime lab. Platt reported the confession to his superiors, and FDLE reviewed Scott's cases from the prior eighteen months, including his identification of Reed's fingerprint on April 7. Scott was suspended on June 4 and resigned prior to June 17. FDLE conducted an internal investigation and involved the State Attorney's office in order to determine if there had been a prosecutable offense. As cases on which Scott had worked were brought to trial and FDLE received subpoenas for trial and deposition, the State Attorney's office was informed that Scott had resigned during the course of an internal investigation. Finally, Platt testified that Scott's work was always reviewed by his supervisor, Ernest Hamm, who testified at the evidentiary hearing and lent full support to Scott's abilities and identification.
*431 Former Assistant State Attorney Steve Kunz testified that although the Scott investigation was referred to the State Attorney's office for Duval County, Scott was not prosecuted because "there was no corpus for the criminal offense" beyond Scott's own admission. The circuit court admitted a letter written by Kunz on August 28, 1986, informing FDLE that criminal charges would not be filed against Scott for that reason. Kunz testified that he would have discussed the case with his supervisor but did not recall discussing it with the prosecutor in Reed's case, who also testified that no one told him about the Scott investigation. The prosecutor further testified that had he known about it, he likely would have notified Reed's counsel but simply presented the testimony of Ernest Hamm instead.
In denying Reed's Brady claim, the circuit court cited Breedlove v. State, 580 So.2d 605 (Fla.1991). We agree with the circuit court that the Breedlove decision supports the conclusion that even if this evidence was erroneously withheld, prejudice did not ensue. In Breedlove, this Court wrote:
While defense witnesses may be impeached only by proof of convictions, the rule regarding prosecution witnesses has been expanded. Thus, this Court has stated: "[I]t is clear that if a witness for the State were presently or recently under actual or threatened criminal charges or investigation leading to such criminal charges, a person against whom such witness testifies in a criminal case has an absolute right to bring those circumstances out on cross-examination[.]" Fulton v. State, 335 So.2d 280, 283-84 (Fla.1976) (quoting Morrell v. State, 297 So.2d 579, 580 (Fla. 1st DCA 1974))....
This reasoning has been generally accepted when a state witness has been charged with a crime....
If a state witness is merely under investigation, however, the ability to cross-examine on such investigation is not absolute. Instead, any criminal investigation must not be too remote in time and must be related to the case at hand to be relevant.
580 So.2d at 607-08. The Court then reviewed numerous cases in support of this conclusion. Significantly, although Breedlove was decided after Reed's trial, many of the cases cited therein, including this Court's Fulton decision, preceded Reed's trial. The Breedlove decision indicates that in order for Reed to have introduced at trial for impeachment purposes evidence of Scott's cocaine use and the subsequent investigation, he first would have been required to show that the investigation was both related to Reed's case and not too remote in time. Although the investigation occurred in the same year as Reed's trial, it is important to note that Scott's testing of the fingerprints in this case was completed prior to his confession and the investigation, and his testimony at Reed's trial occurred after the State Attorney's office had already concluded it could not and would not press charges against Scott. More importantly, the investigation into Scott's cocaine use is not sufficiently related to Reed's case to have permitted its admission. Unlike those cases noted in Breedlove where the particular facts indicated that a witness had a reason to present false testimony in a specific case, here Reed's allegation of bias is general. His theory does not explain why Scott gave specific testimony in Reed's case but rather why Scott was willing to give testimony favorable to the State in any case. Therefore, we agree with the circuit court that this evidence would not have been admissible even if provided to the defense. Further, *432 it is clear that Reed was not prejudiced by the lack of this evidence. The State could have and likely would have presented Hamm's testimony in substitution. Because the third prong of Brady has not been met, we affirm the denial of this claim.[9]
Reed's seventh claim is that the circuit court erred in finding no ineffective assistance regarding his trial counsel's failure to challenge the chain of custody of the State's physical evidence. At trial, Reed's counsel stipulated to all chain-of-custody issues, stating that he thought such testimony would unnecessarily lengthen the trial. Nonetheless, the State did present limited testimony regarding the chain of custody through the testimony of Steve Leery, Carol Herring, and Paul Doleman. At the evidentiary hearing, trial counsel explained his decision:
[M]y policy has always been to stipulate to chain of custody when I know the state could prove it anyway, and after the pretrial discovery showed that the chain of custody was intact I routinely have done that. I think that a jury is affected by everything they see you do in the courtroom and everything you can do to subtly enhance your credibility with them, part of which is stipulating to things that the state is going to prove readily or stipulate to things that need to come in the record but don't have lots of significance and you can't win an argument over them anyway, I think those things are part of the subtle signals that a jury looks at to decide whether or not they can believe you when you are talking to them in closing arguments to tell them why this case has defects in it.
Below, Reed neither questioned trial counsel about this issue nor presented evidence indicating that the chain of custody was flawed. The circuit court concluded that trial counsel's decision was appropriate under the circumstances and likely enhanced his credibility before the jury by stating, "Do graciously that which you must do anyway." Indeed, where counsel has reason to believe pursuing certain lines of defense would be fruitless or even harmful, counsel does not act unreasonably in not pursuing them. Strickland v. Washington, 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Here, both the trial transcript and testimony at the evidentiary hearing indicate that trial counsel believed challenging the chain of custody of the State's evidence would be fruitless. Reed has presented no evidence indicating otherwise. Therefore, we affirm the circuit court's denial of this claim. Cf. Pope v. State, 569 So.2d 1241, 1246 (Fla.1990) (finding no ineffective assistance where counsel stipulated to unavailability of State witness, thereby allowing admission of deposition, *433 where witness was in fact unavailable; noting to hold otherwise "would preclude counsel from ever entering into such stipulations which serve to avoid the unnecessary consumption of time at trial").
Reed's eighth claim is that the circuit court erred in finding no ineffective assistance regarding his trial counsel's concession of guilt to a lesser included offense. During first and last closing arguments, Reed's counsel emphasized two major points: (1) the jury should hold the State to its high burden of proof; and (2) the jury should not make decisions based on their emotions about the crime. More specifically, he argued that the State's case consisted entirely of circumstantial evidence and did not meet the requirement that circumstantial evidence be inconsistent with any reasonable hypothesis of innocence. To illustrate that point, he stated:
And what if there were testimony that he entered the house with the intention of either asking for money and thinking there was no one there and getting money and what if he was horrified to have found Betty Oermann there having been murdered and raped and in that state of confusion and drinking or whatever hiswhatever his situation was then, went ahead and took Betty Oermann's purse and left.... Now, the question, and this may be the most significant question that you can ask yourselves ... can you eliminate that as a hypothesis based on the evidence that has been presented to you.... Being a thief doesn't make you a rapist and a murderer.
....
I think you can legitimately on this evidence find him guilty of a theft and that theory is every bit as consistent with the established facts as the speculation of the state.
Trial counsel apparently suggested this possibility because he believed the evidence regarding the baseball cap was strong enough to place Reed at the scene of the crime.[10] Reed here claims his counsel rendered ineffective assistance by effectively conceding guilt of theft because by all appearances at trial, the same person committed all three crimes of robbery, rape, and murder.
In denying this claim, the circuit court first noted that Reed offered no evidence in its support at the evidentiary hearing and thereby abandoned the claim. Because the nature of the claim requires only record support and legal arguments, which Reed made in his written closing arguments below, we reject this basis for denial of the claim. However, the circuit court also found that trial counsel's argument could not be construed as a confession of Reed's guilt to the crimes charged, writing, "At worst, one might opine that trial counsel suggested to the jury that the defendant might be guilty of some lesser crime. [But at] least two (2) post-Nixon cases suggest that concession to a lesser included offense ... might actually be the appropriate tactical decision to be made by trial counsel." Post-conviction order at 18. Indeed, this Court has said:
Sometimes concession of guilt to some of the prosecutor's claims is good trial strategy and within defense counsel's discretion in order to gain credibility and acceptance of the jury.

*434 When faced with the duty of attempting to avoid the consequences of overwhelming evidence of the commission of an atrocious crime, such as a deliberate, considered killing without the remotest legal justification or excuse, it is commonly considered a good trial strategy for a defense counsel to make some halfway concessions to the truth in order to give the appearance of reasonableness and candor and to thereby gain credibility and jury acceptance of some more important position.
Atwater v. State, 788 So.2d 223, 230 (Fla. 2001) (quoting McNeal v. State, 409 So.2d 528, 529 (Fla. 5th DCA 1982)). This was clearly trial counsel's objective given his concession to the jury that the baseball cap evidence was strong and the fact that following closing arguments he requested that theft be added to the verdict form as a lesser included offense of robbery. Trial counsel's testimony at the evidentiary hearingthat he was trying to convince the jury that although Reed may have done something, it was not premeditated murdersupports the circuit court's ruling. Therefore, we affirm the denial of this claim.[11]
Reed's ninth claim is that the circuit court erred in finding no ineffective assistance regarding his trial counsel's failure to present mitigation. The record reflects that at the beginning of the penalty phase, Reed's trial counsel informed the court that he had reviewed aggravating and mitigating factors with Reed and discussed those he believed applied. He also stated that he informed Reed of his right to take the stand, Reed had "steadfastly maintained his innocence," and Reed did not wish to take the stand. The court then inquired of Reed, who affirmed his counsel's statements were true, and the penalty phase went forward with neither side presenting additional evidence but both making penalty-phase arguments. After the jury delivered its eleven-to-one recommendation of a death sentence, the judge reviewed a presentence investigation report, a psychiatric examination report by Dr. Ernest Miller and Karen Kaldor, and mitigating evidence presented by Reed's trial counsel in the form of past medical records.[12] *435 At the evidentiary hearing below, Reed presented family background testimony by his brother, sister, and former coach, as well as mental health testimony by psychologist James Larson. Reed argued that, considering the strength of the evidence against him in the guilt phase, his trial counsel should have investigated, developed, and presented a strong body of mitigating evidence. In response, the State presented Reed's trial counsel, who testified that (1) Reed had rejected the use of testimony about his mental condition because he did not want his counsel to argue any circumstances that would imply guilt, and (2) Reed rejected the use of testimony by family and friends because he did not want them involved in his trial. He also testified that he explained to Reed prior to trial the risk of not preparing mitigation given the high likelihood he would be convicted and again discussed the matter with him immediately after the conviction.
In denying Reed's claim that his counsel was ineffective for failing to present mitigating evidence, the circuit court wrote:
[I]t was uncontroverted that the defendant specifically refused to permit trial counsel to offer mitigation which would in any way suggest his guilt of the crimes with which he had been charged. Furthermore, apparently on at least two (2) occasions, the defendant instructed trial counsel not to involve family members in the trial. That the defendant gave trial counsel such instructions is confirmed (albeit indirectly) by the handwritten waiver form signed by the defendant. While the form is more directly related to the defendant's waiver of trial evidence, paragraphs seven (7) and twelve (12) confirm trial counsel's testimony regarding the defendant's instructions declining any evidence of his guilt. It also confirms that trial counsel and the defendant discussed the admission of psychological evidence.
Postconviction order at 21.[13] The court further noted that Reed's brother's testimonythat he and Reed had a fight, after which Reed left Tennessee and was never heard from again and that Reed did not contact him during the ten years following the trialconfirmed that Reed did not want his family involved in his defense. The court thus concluded that Reed waived the presentation of mitigating evidence *436 by his instructions to his counsel and could not now be heard to complain in postconviction proceedings.[14]
In addition to finding the claim precluded by Reed's prior waiver, the circuit court concluded, given the nature of the evidence presented at the hearing below, that "it is highly unlikely that the jury would have considered this evidence to be mitigating." Postconviction order at 24. Specifically, regarding the family background testimony, the court wrote:
In fact, the brother related an instance in which he had taken the defendant into his residence because of the defendant's destitute situation. During the course of that stay, the brother found that the defendant was continuing his substance abuse and essentially evicted him from his home. Sometime during the course of this conflict, the defendant threatened the brother's wife. These facts, had they been heard by the jury, seem to be entirely too similar to the evidence adduced during trial, that being that the defendant was again taken into someone's residence, again lost his permission to be in the residence, and again threatened the woman of the house. The jury might also have heard that on one (1) occasion, the defendant had actually physically abused his grandmother and broken her nose.... [H]ad this evidence been known to trial counsel at the time, it is likely that he would not have opted to introduce it. If nothing else, the evidence would tend to support the state's trial position that the defendant was a substance abuser prone to violence.
... [H]ad these family members testified, they would have more than likely been cross-examined by the state on the defendant's criminal record, his substance abuse, his propensity to violence and his otherwise questionable character.
Postconviction order at 24. And regarding the mental health testimony, the court reviewed Dr. Larson's testimony, the main conclusion of which was that Reed had an antisocial personality disorder coupled with a narcissistic personality disorder and found "it is all too likely that this sort of psychiatric testimony would have fit perfectly into the picture of the defendant painted by the state at trial, a substance abuser whose self-indulgence permitted him to commit unrestrained acts against others, including those who had ventured to love and care for him." Postconviction order at 28.
We conclude that the circuit court properly applied the law to this claim and that competent, substantial evidence supports the circuit court's ruling. First, we note that trial counsel clearly investigated or was aware of Reed's background and mental health to an extent, as evidenced by the presentence investigation report, psychiatric report, and medical records presented to the trial court for penalty-phase consideration. Those reports and records contained much of the mitigating information testified to by Reed's brother and sister. Second, we agree with the circuit court that even if Reed's counsel had gone against his client's wishes and investigated further, the testimony that could have been presented was just as *437 likely to have resulted in aggravation against rather than mitigation for Reed.
An ineffective assistance claim does not arise from the failure to present mitigation evidence where that evidence presents a double-edged sword. See, e.g., Carroll v. State, 815 So.2d 601, 614-15 & n. 15 (Fla.2002); Asay v. State, 769 So.2d 974, 988 (Fla.2000). Here, the family background testimony involved numerous facts that placed Reed in a very negative light, such as that he once broke his grandmother's nose, abused drugs over many years, was jailed on various occasions, continued his drug use after his brother took him in on the condition that he stop using drugs, and threatened to kill his brother's wife. Not only was this evidence negative in general but was also particularly disadvantageous in light of the facts of the crime. It would have opened the door for the State to draw a parallel between Reed's violent reaction to being evicted from his brother's home due to his drug use and the victim's murder after she and her husband discontinued assistance to Reed, also due in part to his drug use. Also, testimony regarding Reed's violence toward his grandmother and threats toward his brother's wife would have established a pattern of violence against women who had taken him into their homes. As for the mental health evidence, the circuit court correctly noted that Dr. Larson himself acknowledged certain aspects of his examination and testimony might have been more helpful to the State than the defense. Furthermore, this Court has acknowledged in the past that antisocial personality disorder is "a trait most jurors tend to look disfavorably upon." Freeman v. State, 852 So.2d 216, 224 (Fla.2003).
We further conclude that the instant case is distinguishable from Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), in which the United States Supreme Court found the decision of Wiggins' counsel not to expand their investigation into mitigation fell below the prevailing professional standards. The primary concern in Wiggins was that Wiggins' counsel's failure to thoroughly investigate "resulted from inattention, not reasoned strategic judgment." Id. at 2537. In the instant case, however, there is competent, substantial evidence that Reed's counsel advised Reed of the risks of not presenting mitigation evidence and that Reed steadfastly rejected both its investigation and presentation. Furthermore, in Wiggins, the Court found that his counsels' failures prejudiced Wiggins because they never learned of much of his life history. Here, however, a comparison of the testimony given at the evidentiary hearing with the information contained in the presentence investigation report, psychiatric examination report, and past medical records obtained and presented by Reed's counsel[15] reveals Reed's counsel was aware, even without further investigation, of the family and medical facts of Reed's background relevant to mitigation, including that Reed's education was limited, his father died after being shot by his mother, his mother suffered from alcoholism, and he was previously diagnosed as suffering from lead encephalopathy and substance abuse problems.
Reed's tenth claim is that the circuit court erred in summarily denying his claim of ineffective assistance regarding his trial counsel's failure to object to the jury instruction on the aggravator of murder committed in the course of an enumerated felony. Because this Court has repeatedly rejected the argument that the murder in the course of a felony aggravator is an *438 unconstitutional automatic aggravator,[16] we find this claim meritless and properly denied.
Reed's eleventh claim is that the circuit court erred in finding no ineffective assistance regarding his trial counsel's failure to object to references by the prosecutor to the victim's husband as "Reverend" and "a minister," as well as testimony by State witnesses indicating that Reed was unemployed, cohabited with his girlfriend, had illegitimate children, and was a drug abuser. However, it is clear from the record that in order to understand how Reed knew the victim, the jury needed to know that, through Traveler's Aid, Reverend Oermann met and sheltered Reed, Niznik, and their small children when they arrived homeless and destitute in Jacksonville. Further, they needed to know that Reverend Oermann was away from home at specific times on the night of the murder because he had a church function to attend at 6 p.m. Thus, his status as a minister was inextricably intertwined with these necessary facts. And, in order to understand motive, the jury needed to know that Reed was asked to move out when Reverend Oermann discovered he had drug paraphernalia, the Oermanns continued to provide financial support to Reed until they determined he was not making an effort to obtain steady employment, and thereafter Reed told Lisa Smith about these events and vowed to "get even" with the Oermanns. We find no error in the circuit court's rejection of this claim.
Reed also claims that his counsel rendered deficient performance by not objecting to an argument made by the prosecutor at the end of his penalty-phase closing argument that the jury should "show that defendant the same mercy and sympathy that he showed Betty Oermann on February 27, 1986 and that was none." This Court clearly disapproves of this type of argument. See, e.g., Richardson v. State, 604 So.2d 1107, 1109 (Fla.1992); Thomas v. State, 748 So.2d 970, 985 n. 10 (Fla.1999) ("[A]sking a jury to show as much mercy to a defendant as he showed the victim is a clear example of improper prosecutorial misconduct, which constitutes error and will not be tolerated."). However, this Court also has repeatedly found "no mercy" arguments, standing alone, do not amount to reversible error. See Kearse v. State, 770 So.2d 1119, 1130 (Fla.2000) (stating that "single erroneous comment was not so egregious as to require reversal of the entire resentencing proceeding"); Richardson, 604 So.2d at 1109 (concluding, in light of the entire record, that single comment was harmless beyond a reasonable doubt); see also Rhodes v. State, 547 So.2d 1201, 1206 (Fla. 1989) (stating, despite fact that cumulative effect of five egregious comments including a "no mercy" argument required reversal, "none of these comments standing alone may have been so egregious as to warrant a mistrial"). Given the singular nature of the prosecutor's improper "no mercy" argument here, we find no error in the circuit court's holding that trial counsel's failure to object did not constitute ineffective assistance of counsel.
Finally, Reed asserts cumulative error. However, because this Court affirms the denial of each of his individual claims, we likewise affirm the denial of his cumulative error claim.

PETITION FOR WRIT OF HABEAS CORPUS
Reed's first claim in this petition is that Florida's capital sentencing scheme is unconstitutional *439 under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court has consistently rejected Ring claims in postconviction cases. See, e.g., Pace v. State, 854 So.2d 167 (Fla.2003), cert. denied, ___ U.S. ___, 124 S.Ct. 1155, 157 L.Ed.2d 1049 (2004); Chandler v. State, 848 So.2d 1031 (Fla. 2003); Banks v. State, 842 So.2d 788 (Fla. 2003); Jones v. State, 845 So.2d 55 (Fla. 2003); Cole v. State, 841 So.2d 409 (Fla. 2003); Porter v. Crosby, 840 So.2d 981 (Fla.2003); Lucas v. State, 841 So.2d 380 (Fla.2003); Spencer v. State, 842 So.2d 52 (Fla.2003); Fotopoulos v. State, 838 So.2d 1122 (Fla.2002); Bruno v. Moore, 838 So.2d 485 (Fla.2002), cert. denied, ___ U.S. ___, 124 S.Ct. 100, 157 L.Ed.2d 72 (2003); Marquard v. State, 850 So.2d 417 (Fla. 2002); Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002); King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002). We likewise reject Reed's claims.
Reed's second claim is that he was denied effective assistance of counsel by his appellate counsel's failure to raise on direct appeal the prosecutorial comments addressed above. For the same reasons indicated above, we deny this claim. Where trial counsel's failure to object at trial is found not to be ineffective assistance of counsel, appellate counsel's failure to raise the same claim on direct appeal likewise cannot be found to constitute ineffective assistance.
In Reed's first rule 3.850 motion, he claimed the jury instructions on all of the aggravating circumstances in his case were unconstitutionally vague. The circuit court denied that claim, and this Court affirmed, stating, "This issue is procedurally barred because Reed did not object to the instructions at trial nor did he raise this issue on direct appeal." Reed, 640 So.2d at 1096. In his third claim in this petition, Reed now asserts that he was denied effective assistance of counsel by his appellate counsel's failure to raise this issue on direct appeal. However, in addition to noting that this issue was not preserved for appellate review, we further conclude that it is extremely unlikely that Reed would have successfully appealed this issue because each of the four aggravating circumstances that remained following Reed's direct appeal have withstood similar attacks. See Banks v. State, 700 So.2d 363, 367 (Fla.1997) (finding instruction of aggravating circumstance of committed while engaged in a sexual battery does not constitute an automatic aggravator); Whitton v. State, 649 So.2d 861, 867 n. 10 (Fla.1994) (noting the avoid arrest factor does not contain terms so vague as to leave the jury without sufficient guidance for determining the absence or presence of the factor); Washington v. State, 653 So.2d 362 (Fla.1994) (finding HAC aggravating circumstance was neither vague nor arbitrarily and capriciously applied); Kelley v. Dugger, 597 So.2d 262 (Fla.1992) (rejecting argument that aggravating factor of pecuniary gain was overly broad). Appellate counsel's failure to appeal an unpreserved and meritless issue is not deficient performance.
In his final claim, Reed asserts he was denied effective assistance of counsel because his trial counsel failed to bring a motion for new trial, motion for judgment of acquittal, or other motion challenging the legal sufficiency of the State's case. Citing Robinson v. State, 462 So.2d 471 (Fla. 1st DCA 1984), he asserts his appellate counsel was per se ineffective for failing to challenge the sufficiency of the evidence on direct appeal. To the extent that Reed claims his trial counsel rendered ineffective assistance of counsel, this issue is *440 improperly raised in a petition for writ of habeas corpus. Furthermore, it should be noted that trial counsel moved for directed judgment of acquittal at the conclusion of the State's case-in-chief. Regarding Reed's claim of ineffective assistance of appellate counsel, reliance on Robinson is improper. Robinson addressed whether the failure to timely file a motion for new trial that results in the loss of all judicial review of the evidence constitutes ineffective assistance of trial counsel. This Court retains authority to review the sufficiency of the evidence in death penalty cases regardless of preservation of the issue. Furthermore, although this Court did not expressly state in its decision on direct appeal that it found the evidence sufficient to sustain Reed's convictions, the Court did list as the "most significant evidence of Reed's guilt" the following:
(a) Witnesses said they had seen Reed wearing his baseball cap on the day of the murder before the probable time of death but not thereafter. They positively identified the cap as Reed's because of the presence of certain stains and mildew.
(b) Reed's fingerprints were found on checks that had been taken from the Oermann home and had been found in the yard.
(c) An expert witness gave testimony that hairs found on the body and in the baseball cap were consistent with Reed's hair.
(d) Another expert witness gave testimony that the semen found in the body could have been Reed's.
(e) Reed's cellmate, Nigel Hackshaw, gave testimony that Reed had admitted breaking into the Oermann house and killing Mrs. Oermann.
Reed, 560 So.2d at 204. Clearly, this Court found the evidence presented at trial sufficiently supported Reed's convictions. If appellate counsel had challenged the sufficiency of the evidence on direct appeal, we would have found no merit to that claim. Thus, appellate counsel's performance was neither deficient nor prejudicial due to the failure to argue insufficiency of the evidence on direct appeal.

CONCLUSION
For the above reasons, we affirm the circuit court's denial of Reed's rule 3.850 motion for postconviction relief and deny the petition for a writ of habeas corpus.
It is so ordered.
WELLS, PARIENTE, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
PARIENTE, J., concurs specially with an opinion.
ANSTEAD, C.J., concurs in result only.
PARIENTE, J., specially concurring.
I concur in all aspects of the per curiam opinion in this case except for its discussion of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), in which the majority fails to point out that Reed's conviction of a separate offense by unanimous jury verdict supports an aggravator that exempts the sentence from the requirements of Ring. In this case, the State charged sexual battery in addition to first-degree murder, and the jury unanimously found Reed guilty of both crimes. The trial court's reliance on the sexual battery conviction to support the aggravating factor of murder in the course of a felony removes Reed's sentence from Ring's requirement that any fact necessary for the imposition of death be found by the jury beyond a reasonable doubt. Therefore, despite the absence of a unanimous death recommendation, Reed is not *441 entitled to relief under Ring. See Jones v. State, 845 So.2d 55, 74 (Fla.2003).
NOTES
[1] While the circuit court had summarily denied Reed's ineffective assistance claims because he invoked the attorney-client privilege, thereby "depriv[ing] himself of any prima facie presumption of correctness," this Court held that Reed waived his attorney-client privilege when he filed a postconviction motion claiming ineffective assistance of counsel. Reed v. State, 640 So.2d 1094, 1096-97 (Fla. 1994).
[2] Huff v. State, 622 So.2d 982, 983 (Fla. 1993).
[3] Those claims were that his trial counsel failed to object to the State's allegedly race-based use of peremptory challenges; failed to obtain a jury instruction that a felony murder determination is not, in itself, a sufficient aggravator to justify the death penalty; failed to bring a motion before the trial court to vacate the judgment and sentence after this Court struck two aggravators on direct appeal; and failed to object to the heinous, atrocious, or cruel (HAC) and CCP jury instructions.
[4] Those claims were that there was newly discovered evidence, which was based on a State witness's recantation, and numerous claims of ineffective assistance of counsel, which included that Reed's counsel (1) failed to consult independent hair, serologyst, or fingerprint experts; (2) failed to present expert serological testimony regarding Reed's nonsecretor status; (3) failed to present an alibi defense; (3) failed to effectively impeach Nigel Hackshaw; (4) failed to challenge the chain of custody; (4) failed to object to prosecutorial references to the victim as a minister's wife and to the negative characterizations of Reed; (5) conceded Reed's guilt and that the crime was heinous during closing argument; (6) failed to present mitigating evidence of family background or psychiatric testimony; and (7) failed to object to statements indicating that the defense had the burden of proving mitigators outweighed aggravators.
[5] Nichols testified that he reached that conclusion on the basis of the following. During the course of representation, Reed suggested he had consensual sex with the victim, but someone else had killed her. When questioned regarding his fingerprint on the victim's check that was found in the backyard, Reed's response suggested surprise that he had dropped it. When confronted with the testimony of Nigel Hackshaw reporting Reed's jailhouse confession, Reed acted annoyed, commenting that he did not expect Hackshaw to cooperate with the State and did not expect that his statements would be repeated. And when asked about witnesses who would establish an alibi, Reed intimated that it would be a waste of trial counsel's time to look for alibi witnesses.
[6] Although Reed's claim here focused upon the failure to retain a hair expert, he generally argued that trial counsel failed to test the State's evidence as severely as possible. Trial counsel indicated at the evidentiary hearing that even in cases where he believes the defendant is guilty, it is his "obligation to hold the state's feet to the fire and make sure the evidence is legally gathered and legally presented and legally sufficient." The circuit court expressly found trial counsel's testimony to be credible. But even assuming arguendo that he could have more severely tested the State's hair evidence by the suggestion of other means of transference, there is no reasonable probability that but for any failure to suggest alternative scenarios the result of the proceeding would have been different. The circuit court correctly noted that the identification of Reed's hat was the more telling evidence. Indeed, when noting the most significant evidence, this Court listed the hat identification and fingerprint evidence before the hair evidence.
[7] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).
[8] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[9] Reed asserts a second Brady claim that the State failed to disclose the existence of Officer Summersill, who possessed information about Reed's whereabouts on the afternoon of the murder. In its final order below, the circuit court failed to address Officer Summersill with regard to the Brady claim. However, in addressing Reed's alibi claim, the court did conclude that trial counsel was not ineffective in failing to discover the existence of the police report documenting Officer Summersill's contact with Reed. The court concluded use of the report at trial "would have done nothing more than to damage the defendant as its contents certainly would have been used by the state to impeach the defendant's statement given to the police [that he had been home the entire day]." Postconviction order at 14. The circuit court's conclusion that Officer Summersill's report and testimony would have been harmful rather than helpful implies that it also found no Brady violation because prejudice did not ensue. Because the timing of Officer Summersill's contact with Reed was such that it was neither inconsistent with the State's evidence nor supportive of an alibi defense, we likewise conclude that no Brady violation occurred since prejudice has not been proven.
[10] Prior to this hypothesis, trial counsel stated to the jury, "Now, there's one thing I think that you can fairly assume.... I think you're going to conclude, I think you're going to conclude that that's Mr. Reed's hat ... that earlier in the day he had it on and that sometime after 5:45 and before Reverend Oermann came home that he was in the house."
[11] Additionally, Reed claims his counsel effectively conceded the HAC aggravating circumstance in the guilt-phase closing arguments. The relevant argument followed trial counsel's discussion of the importance of the State's high burden of proof:

Nobody among us now is going to stand up and say that's too tough.
Nobody among us now is going to say you relax that standard. This is such a heinous event, and it is heinous, and this is such a despicable human being and there's no proof of that, that you should play the odds, that you should find this man guilty on speculation.... When a prosecutor says that to you ... he's saying you relax this standard ... you find him guilty ... even though the testimony doesn't stand up to objective, rational scrutiny.
Clearly, the point of this argument was not to concede the HAC aggravator but rather to acknowledge the brutality of the crime in an attempt to sympathize with the jury's emotional reaction to it, warn them against a misguided desire to convict anyone on the basis of that emotional reaction, and ensure they held the State to its burden of proof in the guilt phase. Furthermore, given the facts of this case, we cannot find that, in the absence of this comment, the HAC aggravator would not have been found by the judge or jury.
[12] The presentence investigation report contained a socioeconomic status report indicating: Reed's highest completed grade was the eighth grade; he previously was employed as a laborer and had five jobs in the prior two years; his father died in 1961 after being shot by his mother in self-defense; he had a one-year-old child to whom he provided voluntary support; he was diagnosed as suffering from lead intoxication and multiple substance abuse problems in 1981; and he was hospitalized for approximately one month at that time due to what Reed described as a "nervous breakdown." Additionally, the report contained comments by Reed's grandmother indicating that she never knew him to want to hurt anyone, believed his stepfather whipped the children and withheld food, and gained custody of her grandchildren due to Reed's mother's alcoholism and lack of interest in the children. The psychiatric examination report indicated mental status and neurologic testing were performed on Reed, as well as an extensive background review. The report repeated that Reed had an eighth grade education, was taken from his mother due to her alcoholism, and was treated in 1981 for lead encephalopathy related to the inhalation of gas fumes. The report reflected a normal waking electroencephalogram and a clinical impression of substance abuse disorder. The past medical records reflected Reed's long history of gasoline sniffing, Valium abuse, and the resulting lead encephalopathy and seizure disorder upon drug withdrawal. They also contained doctors' notes indicating Reed had previously shown bizarre and abusive behavior and combativeness at home.
[13] The form referenced by the circuit court is a waiver of the right to present evidence in the guilt phase. Therein, Reed wrote, at paragraph seven, "I have refused to allow my attorney to ascert [sic] or put forward any defense which assumes or implies I murdered Betty Oermann," and, at paragraph twelve, "My attorney has advised me that he believe[s] the chances of being sentenced to death were hypothetically less if I pled guilty and presented mitigating psychological evidence."
[14] We note that this conclusion is not inconsistent with this Court's case law. See Sims v. State, 602 So.2d 1253, 1257-58 (Fla.1992) (finding no error in trial counsel's failure to investigate mitigating evidence where client directed counsel not to; "Counsel certainly has considerable discretion in preparing a trial strategy and choosing the means of reaching the client's objectives, but we do not believe counsel can be considered ineffective for honoring the client's wishes.").
[15] See supra note 12.
[16] See, e.g., Blanco v. State, 706 So.2d 7, 11 (Fla.1997).