# Supreme Court of Florida

_____

No. SC12-1252
_____

**CHARLES L. ANDERSON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

_____

No. SC14-881
_____

**CHARLES L. ANDERSON,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[March 9, 2017]

PER CURIAM.

Charles Anderson appeals an order denying his motion to vacate his

conviction of first-degree murder and sentence of death filed under Florida Rule of

Criminal Procedure 3.851. Anderson also petitions this Court for a writ of habeas

corpus.  We have jurisdiction.  See art. V, § 3(b)(1), (9), Fla. Const.  For the

reasons expressed below, we affirm the postconviction court's order as to

Anderson's conviction and deny Anderson's habeas petition but vacate the death

sentence and remand for a new penalty phase.

## I.  BACKGROUND

In 1999, Anderson was convicted and sentenced to death for the first-degree

murder of his stepdaughter, Keinya Smith.  The facts of the murder were set forth

in this Court's opinion on direct appeal as follows:

> In 1980, Charles Anderson married Edwina. At the time of the marriage, Edwina had a five-year-old daughter (Keinya) from a previous relationship.  In 1992, the Miami police became aware that Anderson was sexually abusing Keinya.  He subsequently pled to eleven counts of attempted capital sexual battery and was sentenced to probation.  One of the conditions of the probation was that he have no contact with Keinya.  If Anderson violated probation, he faced the possibility of life in prison.
>
> Despite the conditions of his probation, witnesses testified that Anderson continued to have contact with Edwina and Keinya. Apparently he spent several nights a week at Edwina's house.  On Wednesday, January 12, 1994, Keinya was supposed to leave her job at Publix at 6 p.m., yet she did not return home until much later.  A Publix employee by the name of Patrick Allen drove Keinya home. After dropping Keinya off, Allen realized that he was being followed by an individual in another car.  Allen ultimately eluded the individual. When Allen was later shown photographs of Anderson's car, he was able to verify that the car that chased him belonged to Anderson.
>
> Two nights later, on Friday, January 14, Allen brought Keinya home again.  Anderson was sitting in his car waiting for Keinya to return, and as soon as Keinya got out of Allen's car, Anderson's car darted toward Allen.  Another chase ensued, and this time Allen fired several gunshots at Anderson during the chase.  When Anderson

- 2 -

returned home, he and Keinya got into a heated argument. A neighbor testified that she overheard Anderson say to Keinya, "You told him. Why was he shooting at me?" and that Keinya responded, "I didn't tell him nothing." A cousin who was present during the argument testified that Anderson hit Keinya. Keinya then grabbed a knife and said, "Let me call the police." She proceeded to dial 911, but when the operator picked up, Keinya hung up the phone. The 911 operator called back, but was unable to get an answer and therefore a police car was sent to the house. When the police arrived, both Anderson and Edwina went outside and talked to the police. Keinya locked herself in her room. Anderson and Edwina convinced the police that everything was okay and the police left. Keinya's cousin testified that after the police left, Anderson walked to the room where Keinya was hiding and said that he was going to wait in Publix for twenty-four hours—that if he could not get Patrick, then he would come after her. Although Keinya was supposed to work on Saturday, she did not go to work because she was scared.

Keinya did go to work on Sunday, January 16, 1994. Her time card revealed that she left work at 6:01 p.m. Allen testified that he saw Anderson's car waiting outside Publix.

On that same day, John Gowdy and Amelia Stringer were driving north on U.S. 27. Gowdy testified that he saw someone on the side of the road at approximately 7 p.m. Although it was dark at the time, Gowdy was able to see the person in the grass median between the northbound and southbound lanes. Gowdy observed the car in front of him make a U-turn and he did the same thing. Gowdy then witnessed the car in front of him swerve into the median and then back into the lane, apparently running over the person. Gowdy immediately reported the incident to the police. Gowdy described the suspect's car as a blue/gray four-door. Anderson's car is dark blue with a gray top and has two doors. Stringer, who was in the car with Gowdy, saw the person in the median lie down in the grass and then sit up. She also witnessed the car in front of them run over the person in the median.

When the police arrived at the scene, they discovered blood on the pavement, some clothing items, and a name tag which read "Keinya." Items were found in the northbound lane and in the median near the southbound lane. Four tire impressions were taken from the scene. Keinya's dead body was found on Monday, January 17, by a fishing camp in the Everglades.

About a week after the murder, Anderson voluntarily agreed to be interviewed by the police. At one point during the interview, Anderson responded that he did pick up Keinya from work on Sunday night, but that he did not kill her. Within seconds of making this statement, Anderson recanted, claiming that he was being facetious. Anderson consented to a search of his car, although the police already had a warrant. The police took impressions of the car's tires. An expert testified that of the four impressions taken from the scene, one could not have been made by Anderson's tires, one was consistent with Anderson's tires, and the other two impressions were of no value. There was damage to Anderson's radiator, the splash guard was cracked, and an area under the car appeared to have been wiped. Another expert testified that grease marks found on Keinya's jacket could have been made by two coils from underneath Anderson's car. That expert also stated that two other coils from Anderson's car could not have made the grease marks. Several spots in and under Anderson's car were suspected to have blood. There was a positive presumptive result from the car's splash pan, but the police could not get any DNA results from this spot, meaning that it could have been human blood or animal blood. However, a spot of blood on Anderson's car seat matched Keinya's DNA. Finally, a number of fibers were found under Anderson's car. An expert testified that one of the fibers was consistent with fibers from Keinya's pants. Twelve other fibers taken from the car did not match Keinya's clothing.

During the trial, the parties agreed to the following stipulation, which was read to the jury:

> It has been stipulated between parties that Keinya Smith is dead. That she died on January 16, 1994. And that she died as a result of blunt force trauma inflicted by a motor vehicle. It is further stipulated between parties that the items of evidence found on U.S. 27 by Lieutenant Vaughn and Detective Foley, including jewelry, blood stains, name tags and hair and scalp, originated from Keinya Smith.

The State also presented the testimony of Anderson's probation officer, Lisa White, who stated that Anderson was on probation for eleven counts of attempted capital sexual battery on Keinya. White further stated that shortly after Keinya's body was found, Anderson

contacted her and asked whether he could have his family back now that Keinya was dead.

Anderson did not put on any evidence during the guilt phase. At the conclusion of the guilt phase, the jury convicted Anderson of first-degree murder.

During the penalty phase, the State presented the testimony of the medical examiner, who testified that in addition to various other injuries, Keinya's neck was fractured when she was run over by the car, and the fractured neck led to rapid unconsciousness and death. The medical examiner stated that survival following the incident was seconds to minutes at the most. State witness Mitzy Clark testified that on the night of the murder, she was driving on U.S. 27 when she saw a person lunge at her car, trying to get Clark to stop. Clark stated that she did not stop because she was scared. The State also presented the testimony of Edwina, who described the circumstances of Keinya's sexual abuse. Edwina made it clear that Anderson not only attempted, but actually completed the crime of sexual battery:

> Q: Did [Keinya] tell you that [Anderson] inserted his penis inside her vagina on several occasions?
>
> A: Yes.

Edwina also testified that on the Friday before the murder, Anderson said, "I'm going to prison, but somebody is going to be dead, I bet you that." Finally, Edwina stated that Anderson called her on the day of the murder, asked if Keinya was working that day, and asked what time Keinya got off work. Officer Estopinan, the officer who investigated the previous sexual batteries, also testified about the circumstances of Keinya's sexual abuse.

The defense called a number of penalty-phase witnesses who described Anderson's childhood and subsequent addiction to drugs. Anderson also testified on his own behalf. During the course of his testimony, Anderson admitted that he sexually abused Keinya.

The jury ultimately recommended death by an eight-four vote. The trial court found the following five aggravators: (1) Anderson had a previous conviction of a violent felony (the attempted sexual batteries), (2) the murder was committed while engaged in the commission of a felony (kidnapping), (3) the murder was committed to avoid arrest, (4) the murder was heinous, atrocious, or cruel, and (5) the murder was committed in a cold, calculated and premeditated

manner without any pretense of legal justification. The trial court concluded that Anderson failed to establish the statutory mental mitigators. The court found the following nonstatutory mitigators: (1) Anderson suffers from sexual dementia (minimal weight), (2) Anderson confessed to his sexual relationship with Keinya during drug addiction counseling (medium weight), (3) Anderson suffered from drug addiction (minimal weight), (4) Anderson comes from a good family (minimal weight), (5) Anderson was a good child (minimal weight), (6) Anderson helped Edwina take care of his three natural children (minimal weight), (7) Anderson loves his children (minimal weight), (8) Anderson sends gifts to his kids while in custody (minimal weight), (9) Anderson is a very caring person (minimal weight), (10) Anderson served in the Coast Guard for five years (minimal weight), (11) society would be protected by Anderson serving a life sentence (minimal weight), (12) Anderson earned money playing the market while in custody and therefore can still be a productive member of society (minimal weight), and (13) Anderson has a gift for poetry and can help men who end up in prison (minimal weight). The trial court sentenced Anderson to death.

Anderson v. State, 841 So. 2d 390, 394-97 (Fla. 2003) (alterations in original).

Anderson raised thirteen claims on direct appeal.[1] Id. at 397 n.1. We affirmed the conviction and sentence of death. Id. at 409.

---

1. Anderson's claims on direct appeal were:

(1) the evidence is insufficient for first-degree murder; (2) the trial court erred in admitting collateral bad act evidence; (3) the trial court erred in allowing a witness to testify concerning other traffic homicides; (4) the trial court erred in allowing nonresponsive opinion testimony as to the intent of the perpetrator; (5) the trial court erred in admitting inflammatory photographs during the guilt phase; (6) the trial court erred in denying Anderson's motion for mistrial during closing argument; (7) the trial court erred in allowing the State to proceed on a theory of felony murder; (8) the State's penalty phase argument was fundamental error; (9) the trial court erred in admitting inflammatory photographs during the penalty phase; (10) the evidence

## II.  MOTION FOR POSTCONVICTION RELIEF

Anderson initially filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.851 in 2004, and after several amendments to the motion, raised a total of fifteen claims.[2]  On May 7, 2011, after an evidentiary hearing, the trial court denied claims 5, 7, and 10.  All other claims were summarily denied.

In his postconviction appeal, Anderson asserts that the postconviction court erred in summarily denying the following claims: (1) counsel was ineffective at the guilt phase for failing to utilize forensic experts; (2) the destruction of exculpatory

---

did not support the aggravating circumstances in this case; (11) the sentence is disproportionate; (12) the sentence violates Apprendi v. New Jersey, 530 U.S. 466 (2000); and (13) the murder in the course of a felony aggravator is unconstitutional.

Anderson, 841 So. 2d at 397 n.1.

2.  The postconviction claims were: (1) rule 3.852 is unconstitutional; (2) the one-year time limit in rule 3.851 violates due process and equal protection; (3) trial counsel was ineffective for failing to seek a change of venue; (4) guilt-phase counsel was ineffective for failing to utilize forensic experts, failing to call alibi witnesses, stipulating to the cause of death, and failing to visit and consult with Anderson; (5) penalty-phase counsel was ineffective for failing to present sufficient mitigation; (6) penalty-phase counsel was ineffective for failing to properly challenge the medical examiner; (7) a violation of Ake v. Oklahoma, 470 U.S. 68 (1985); (8) the death sentence is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002); (9) denial of juror interviews is unconstitutional; (10) cumulative error; (11) law enforcement's destruction of the murder weapon violated due process; (12) destruction of exculpatory evidence violated due process; (13) Florida's lethal injection protocol is unconstitutional; (14) a violation of the Confrontation Clause; (15) a claim of newly discovered evidence based on a 2009 report from the National Research Council on forensic testing.

evidence by law enforcement violated due process; (3) his death sentence is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002); and (4) newly discovered evidence establishes that the forensic science used at trial is unreliable and invalid.

As to the summary denial of claims raised in a rule 3.851 motion, we have explained:

> "The decision of whether to grant an evidentiary hearing on a rule 3.851 motion is ultimately based on the written materials before the court, and the ruling of the postconviction trial court on that issue is tantamount to a pure question of law subject to de novo review." Therefore, when reviewing the summary denial of claims raised in an initial postconviction motion below, this Court accepts the movant's factual allegations as true to the extent that they are not refuted by the record. A court may summarily deny a postconviction claim when the claim is legally insufficient, procedurally barred, or refuted by the record. "To uphold the trial court's summary denial of claims raised in an initial postconviction motion, the record must conclusively demonstrate that the defendant is not entitled to relief."

Troy v. State, 57 So. 3d 828, 834 (Fla. 2011) (citations omitted).

## A.  Ineffective Assistance of Counsel

In his first issue on appeal, Anderson asserts that the postconviction court erred in summarily denying his claim that guilt-phase counsel was ineffective for failing to utilize experts to challenge the physical evidence admitted against him at trial.  Specifically, Anderson claims that trial counsel should have consulted experts regarding the tire impression evidence, the blood in his car, the grease mark evidence, and the fiber evidence.

The facial sufficiency of an ineffective assistance of counsel claim is determined by applying the two-pronged test of deficiency and prejudice set forth in Strickland v. Washington, 466 U.S. 668, 687 (1984). In order to establish deficient performance, a defendant "must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards." Troy, 57 So. 3d at 834 (quoting Ferrell v. State, 29 So. 3d 959, 969 (Fla. 2010)). To demonstrate prejudice, the "substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined." Id. (quoting Ferrell, 29 So. 3d at 969).

"To be entitled to an evidentiary hearing on a claim of ineffective assistance, the defendant must allege specific facts that are not conclusively rebutted by the record and which demonstrate a deficiency in performance that prejudiced the defendant." Rhodes v. State, 986 So. 2d 501, 513-14 (Fla. 2008) (quoting Jones v. State, 845 So. 2d 55, 65 (Fla. 2003)). Mere conclusory allegations are insufficient to warrant an evidentiary hearing. The defendant bears the burden of "establishing a 'prima facie case based on a legally valid claim.' " Barnes v. State, 124 So. 3d 904, 911 (Fla. 2013) (quoting Valentine v. State, 98 So. 3d 44, 54 (Fla. 2012)). The burden is also "on the defendant, not the State, to show a 'reasonable probability' that the result would have been different" but for counsel's error.

Crain v. State, 78 So. 3d 1025, 1034 (Fla. 2011) (quoting Wong v. Belmontes, 558 U.S. 15, 27 (2009)).  Summary denial is proper where the defendant fails to sufficiently allege both prongs of the Strickland standard.  Rhodes, 986 So. 2d at 514.

### 1. Tire Impression Evidence

At trial, the State presented the testimony of Fred Boyd, a latent print, footwear, and tire-tread analyst.  Boyd testified that in the course of his employment with the Broward County Crime Lab, he was asked to compare photos and casts of the tire impressions left at the scene where Keinya Smith's body was found to standards made from the tires on Anderson's car.  Boyd concluded that two of the tire impressions left near Keinya's body were of no value, the third "could have been made by" Anderson's right front tire, and the fourth impression "could not have been made by" any of the tires on Anderson's car.

The State laid the foundation for Boyd to be deemed an expert in tire-tread examination by asking Boyd about his training and experience.  Boyd testified that he spent the first twenty years of his career as a military policeman in the Army Criminal Investigation Division Crime Lab and retired as chief of the latent print unit in 1988.  He was then employed by the Broward County Crime Lab, where he worked in fingerprints, footwear, and tire-tread examination for the next eight and a half years.  At the time of Anderson's trial in 1999, Boyd was employed with the

- 10 -

Las Vegas Metropolitan Police Department's crime lab as an analyst of fingerprints, footwear, and tires. Boyd testified that the bulk of his training in these disciplines took place when he was in the Army, but he also received continuous training throughout his thirty-one-year career both on the job and through attendance at numerous FBI schools and other seminars. Prior to Anderson's trial, Boyd testified as an expert in tire-tread impression evidence ten times in Broward County. Boyd was tendered to and accepted by the court as an expert in the field of tire examination without objection.

Anderson now claims that counsel was deficient for failing to object to Boyd being deemed an expert because he was not "certified" in tire-tread examination.[3] This claim is without merit. The Florida Evidence Code provides that a witness may be qualified as an expert based on "knowledge, skill, experience, training, or education." § 90.702, Fla. Stat. (1999). There is no requirement that a witness be "certified" in a particular field in order to be deemed an expert and allowed to give opinion testimony. Boyd's specialized knowledge, training, and extensive experience were sufficient for the trial court to qualify him as an expert. An objection on the basis that he was not "certified" in tire examination would have

---

3. Anderson does not allege that such certification exists.

been meritless. "[C]ounsel cannot be deemed deficient for failing to make a meritless objection." Raleigh v. State, 932 So. 2d 1054, 1064 (Fla. 2006).

Anderson also claims that trial counsel was deficient for failing to utilize a defense expert to challenge Boyd's testimony. This claim is also without merit because the alleged deficiency is rebutted by the record. During his cross-examination of Boyd, trial counsel brought out the weaknesses in Boyd's testimony and rigorously challenged its significance by pointing out that Boyd could only say that the right front tire on Anderson's car was "pretty consistent" or "relatively consistent, but not a hundred percent consistent" with the type of tire that left one of the impressions near Keinya's body; the impression was not specific to the tire on Anderson's car but only to the type of tire; Boyd did not know how many of that particular type of tire were manufactured, where in the country they were primarily distributed, or which stores carried the tire; while Anderson's right front tire "could have, possibly" made that impression, there was "no question at all" that another one of the impressions was not made by any of the tires on Anderson's car; Boyd's analysis only looked at "the general class design" of the tire; Boyd never went and looked at the actual tires on Anderson's car; and there was no "positive I.D. on the tire."

Anderson did not allege in his motion or on appeal what information could have been obtained from other experts and used to impeach or discredit Boyd's

testimony.  He made only the general allegation that experts could have impeached Boyd by testifying to "the inadequacy of the science behind the opinion testimony at Mr. Anderson's trial."  Such an allegation is insufficient to warrant an evidentiary hearing.  See Lebron v. State, 135 So. 3d 1040, 1060 (Fla. 2014) (affirming summary denial of ineffective assistance claim based on counsel's failure to properly impeach State witnesses as insufficiently pleaded where defendant did not sufficiently allege what information counsel could have used to impeach the witnesses or otherwise refute their testimony); Reaves v. State, 826 So. 2d 932, 939-40 (Fla. 2002) (affirming summary denial of postconviction claim based upon legal insufficiency where defendant merely alleged that counsel failed to prepare for and adequately cross-examine witnesses without indicating what favorable information could have been elicited from those witnesses or how defendant was prejudiced).  And the record presents no need for impeachment in light of the admitted inconclusive findings of the State's expert.  We therefore affirm the summary denial of this claim.

## 2. Blood Evidence

Anderson argues that counsel was ineffective for failing to utilize defense experts to challenge the State's evidence regarding the spot of Keinya's blood found on Anderson's car seat as it related to the State's theory that Keinya's body was transported in the car from the location where she was run over to where her

body was dumped on the side of the road fifteen miles away. Specifically, Anderson claims that experts could have testified that there was no way to determine when Keinya's blood was deposited on the seat and that there would have been more blood in the car if it had been used to transport her body.

Anderson's claim that trial counsel should have utilized an expert to testify that there was no way to determine when Keinya's blood was left in his car was not raised in his motion before the trial court and is therefore unpreserved and not properly before this Court for review. See Steinhorst v. State, 412 So. 2d 332, 338 (Fla. 1982) ("[F]or an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below."). Moreover, even if Anderson raised this claim below, an evidentiary hearing would have been unwarranted because the record demonstrates that counsel elicited testimony during cross-examination of the State's expert that there was no way to date the blood found in Anderson's car. See Reed v. State, 875 So. 2d 415, 427 (Fla. 2004) (affirming denial of claim that counsel was ineffective for failing to retain a defense expert where facts necessary for defendant's defense were established through cross-examination of State's experts).

Anderson also claims that an expert could have testified that if Anderson ran Keinya over and then transported her "bloody body" fifteen miles in his car to the location where it was found, there would have been much more than one drop of

blood in his car. But the fact that a "bloody body" would transfer more than one drop of blood to a car is "within the average person's realm of knowledge." Id. at 423. Trial counsel did not render deficient performance by failing to retain an expert to explain a fact commonly known. See id. Trial counsel drew the jury's attention to the lack of blood in Anderson's car in both his opening statement and closing argument and he argued in closing that a single spot of Keinya's blood on the passenger seat did not prove that her body was transported in the car. It was not necessary to present testimony from a blood expert for counsel to argue a reasonable inference to be drawn from the evidence presented, and Anderson did not specify how trial counsel's challenge to this aspect of the case would have been any different had an expert been utilized.

Because Anderson failed to identify any specific errors or omissions with respect to the blood evidence that show that counsel's performance deviated from the norm such that it fell outside the range of professionally acceptable performance, he was not entitled to an evidentiary hearing on this claim.

### 3. Grease Pattern Impression Evidence

Anderson also claims that trial counsel performed deficiently in failing to consult experts and challenge the admissibility of the State's expert testimony regarding the grease mark or grease pattern impression evidence. At trial, the State called James Gerhart, an FBI pattern impression expert, to testify regarding his

analysis of the grease marks found on the jacket that Keinya was wearing when she was run over. Gerhart compared the grease marks to four coils taken from the underside of Anderson's car. Gerhart testified that two of the coils from Anderson's car were consistent in size and design and could have made the grease impressions on Keinya's jacket, but that the two other coils were not similar in design and size and could not have made the grease impressions on the jacket. He told the jury that he could not say for certain that Anderson's vehicle made the impressions on the jacket.

According to Anderson, grease pattern analysis is a "suspect field" of forensic science and the validity of such analysis is "highly questionable due to varying methods of testing and examination." Anderson claims that trial counsel should have consulted with other experts in this "suspect field" and had those experts available to testify about the shortcomings of grease pattern impression evidence and to explain why Gerhart's testimony was inadmissible under Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

At the time of Anderson's trial, Florida used the Frye standard to determine the admissibility of expert opinion testimony that relied upon a new or novel scientific principle, theory, or methodology.[4] Under Frye, the principle, theory, or

_____

4. Although in 2013, the Legislature adopted the standard announced in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), this

methodology on which the opinion evidence is based must have been scientifically valid, and the procedures followed to apply the technique or process must have been generally accepted in the relevant scientific community. A <u>Frye</u> hearing was "utilized in Florida only when the science at issue [was] new or novel." <u>Overton v. State</u>, 976 So. 2d 536, 550 (Fla. 2007) (quoting <u>Branch v. State</u>, 952 So. 2d 470, 483 (Fla. 2006)). Pattern impression analysis—which falls under the broader category of trace evidence[5]—was not new or novel at the time of Anderson's trial. <u>See, e.g.</u>, <u>Cochran v. State</u>, 222 So. 2d 462, 463 (Fla. 2d DCA 1969) (noting the admission of expert testimony that cloth impressions left at crime scene could have been made by defendant's gloves). Thus, Anderson would not have been entitled to a <u>Frye</u> hearing, and counsel therefore did not render deficient performance by failing to request a hearing for which there was no legal basis. Nor is there any reasonable probability that such a meritless request would have yielded a different result at trial.

---

legislative change does not apply retroactively. <u>Zakrzewski v. State</u>, 147 So. 3d 531 (Fla. 2014) (table).

5. <u>See</u> David H. Kaye, David E. Bernstein, & Jennifer L. Mnookin, <u>The New Wigmore: A Treatise on Evidence: Expert Trace Evidence</u> § 13.3, at 599 n.1 (2d ed. Supp. 2015) ("[A]ll forms of marks, patterns, impressions, and substances transferred or deposited at a crime scene, on a victim, or on an individual who . . . was present at the location of the crime or had contact with people or objects that were there fall under the broader category of 'trace evidence.' ").

Moreover, trial counsel was able to expose to the jury the "shortcomings" and limited value of the grease impression evidence without retaining another expert. During his cross-examination of Gerhart, counsel pointed out that Gerhart could not positively identify the grease marks on Keinya's jacket as having been made by the coils on Anderson's car due to a lack of identifying characteristics and the best Gerhart could say is that those coils could have made the impressions on the jacket. Gerhart conceded that the other two coils from Anderson's car definitely did not make the impressions on the jacket. Gerhart also admitted that every car has coils and there was nothing unique about the coils in this case.

"Strickland does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense. In many instances cross-examination will be sufficient to expose defects in an expert's presentation." Harrington v. Richter, 562 U.S. 86, 111 (2011). Here, the record demonstrates that the cross-examination conducted by Anderson's trial counsel was sufficient to expose the defects in Gerhart's presentation, and "[t]here is no reasonable probability that re-presenting virtually the same evidence through other witnesses would have altered the outcome in any manner." Atwater v. State, 788 So. 2d 223, 234 (Fla. 2001).

Because we conclude that the alleged deficiencies with regard to the grease pattern analysis are rebutted by the record, we find no error in the summary denial of this claim.

### 4. Fiber Evidence

Trace evidence expert Bruce Ayala testified at Anderson's trial that one of the thirteen fibers found under Anderson's car "could have originated" from the pants Keinya was wearing when she was killed. He concluded that the twelve other fibers taken from the car did not match any of Keinya's clothing. As in the previous claim, Anderson alleges that counsel was ineffective for failing to consult with experts and secure a Frye hearing with regard to the fiber evidence.

We conclude that trial counsel did not render deficient performance because there was no legal basis to support a request for a Frye hearing. Fiber evidence— which also falls under the broader category of trace evidence[6]—was not a new or novel science at the time of Anderson's trial; it has been admitted in Florida courts since at least 1958. See, e.g., Trimble v. State, 102 So. 2d 738, 739 (Fla. 3d DCA 1958) (noting the admission of expert testimony that fibers found underneath defendant's car were similar to those taken from victim's blouse); see also Bundy v. State, 471 So. 2d 9, 20 (Fla. 1985) (noting that no Frye hearing was held with

---

6. See David H. Kaye, et al., supra note 5.

regard to fiber evidence); Bottoson v. State, 443 So. 2d 962, 964 (Fla. 1983) ("There was also expert evidence that clothing fibers similar to those in the victim's clothes . . . were found inside the car."); cf. Johnson v. State, 660 So. 2d 637, 644 (Fla. 1995) ("Gathering any fiber evidence is a common object of any murder investigation . . . ."). Thus, the fiber evidence would not have been deemed inadmissible under Frye or even subject to a Frye hearing. Counsel cannot be deemed deficient for failing to make a meritless objection. See Valentine, 98 So. 3d at 55.

Anderson also asserts that the testing of the fiber evidence was done using "poor analysis and improper methodology" and that counsel performed deficiently in failing to present expert testimony that "could have explained what would have constituted proper methodology." This allegation is conclusory and insufficient to warrant an evidentiary hearing. Anderson also failed to establish that there is a reasonable probability that the outcome of the trial would have been different had counsel utilized an expert to challenge the conclusion of the State's expert that one of the thirteen fibers found under Anderson's car "could have originated" from Keinya's pants.

## 5. Cumulative Prejudice

Even if we were to conclude that trial counsel rendered deficient performance in failing to consult with experts and present expert testimony in

order to more rigorously challenge the tire, blood, grease, and fiber evidence, Anderson would still not be entitled to relief on this claim because he cannot establish prejudice.

The tire, blood, grease, and fiber evidence were equivocal: the tire and grease impressions may or may not have been left by Anderson's car; the drop of blood on the car seat may or may not have been left at the time of the murder; and a single fiber out of the thirteen that were found on the bottom of Anderson's car may or may not have come from Keinya's pants. The other evidence presented at trial established that two eyewitnesses observed a car that they described as similar to Anderson's car running over a person without deviating from its path on the night of the murder in the area where Keinya's hair, scalp, blood, and personal items were found; there was damage to the radiator and splash guard on Anderson's car; an area under the car had been wiped; Anderson's car was seen waiting outside the Publix where Keinya worked just before the murder; Anderson admitted picking Keinya up from work on the night of her murder; Anderson admitted that he had sole control of his car the night Keinya was murdered; within the four days leading up to the murder, Anderson twice used his car to chase after and attack Keinya's co-worker, Patrick, after he drove Keinya home from work; approximately 48 hours before the murder, Anderson hit Keinya and threatened her, and she was so scared that she armed herself with a knife, dialed 911, locked

- 21 -

herself in her room, and did not go to work the next day; despite being on probation for eleven counts of attempted capital sexual battery on Keinya and under a condition that he have no contact with Keinya, Anderson continued to have extensive contact with Keinya in violation of his probation and he faced the possibility of life in prison if Keinya exposed the violation.

In light of the other evidence presented, there is no reasonable probability that had trial counsel more rigorously challenged the equivocal tire, blood, grease, and fiber evidence, Anderson would have been acquitted of first-degree murder. Even if we were to assume that counsel was deficient, our confidence in the outcome would not be undermined.

### B. Failure to Preserve Physical Evidence

Anderson next alleges that the State "willfully or with egregious negligence" caused the deterioration of several key pieces of evidence after his trial. Anderson claims that his car, the tire casts, tire "printouts," and Keinya's clothing were "inappropriately stored" after trial in a manner that destroyed or severely diminished their evidentiary value, which rendered postconviction experts unable to "retest" the evidence and resulted in a violation of Brady v. Maryland, 373 U.S. 83 (1963), California v. Trombetta, 467 U.S. 479 (1984), Arizona v. Youngblood, 488 U.S. 51 (1988), and Anderson's due process rights. Anderson further alleges

that the State was aware of the exculpatory or potentially useful value of this evidence and acted in bad faith in allowing the evidence to deteriorate.

In Brady, the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment requires the State to disclose to criminal defendants favorable evidence that is material either to guilt or to punishment. 373 U.S. at 87-88. "As part of establishing a Brady violation, the defendant must show that favorable evidence was willfully or inadvertently suppressed by the State." Tanzi v. State, 94 So. 3d 482, 494 (Fla. 2012). Evidence is not suppressed under Brady if the defense knew about it. Taylor v. State, 62 So. 3d 1101, 1116 (Fla. 2011).

Anderson has not alleged that any evidence was suppressed by the State, and failure to preserve evidence for retesting during postconviction proceedings does not result in a Brady violation. Thus, Anderson failed to sufficiently plead entitlement to relief under Brady.

In Trombetta, the United States Supreme Court held that the State's constitutional duty to preserve evidence is limited to evidence that "both possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." 467 U.S. at 489. In Youngblood, however, the Supreme Court held that the Due Process Clause requires a different result when the State fails to preserve evidence that does not

possesses an apparent exculpatory value, but which is merely "potentially useful" to the defense. 488 U.S. at 57. "Potentially useful" evidence is evidence "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." Id. When the State fails to preserve potentially useful evidence, due process is violated only if the defendant can show bad faith on the part of the police or prosecution. Id. at 58; Dufour v. State, 905 So. 2d 42, 68 (Fla. 2005). "Under Youngblood, bad faith exists only when police intentionally destroy evidence they believe would exonerate a defendant." Dufour, 905 So. 2d at 68 (quoting Guzman v. State, 868 So. 2d 498, 509 (Fla. 2003)).

Anderson has not demonstrated that the allegedly deteriorated evidence was of an exculpatory nature that was apparent to the State before it was allowed to deteriorate. As to the car, Anderson makes only the following conclusory and fallacious argument: "Law enforcement and the State were well aware of the exculpatory value of the car, because they examined and tested it on several occasions. Testing of a piece of evidence is a clear indication of its exculpatory value." We reject Anderson's assertion that "testing" evidence is a "clear indication of its exculpatory value." Anderson also failed to provide any explanation of how the tire casts, printouts, or clothing were of an exculpatory

- 24 -

nature. Thus, we conclude that Anderson failed to sufficiently plead entitlement to relief under Trombetta.

Even assuming that Anderson could establish that the evidence was "potentially useful," his allegation that the State acted in bad faith in inappropriately storing the evidence resulting in its deterioration is wholly conclusory. He asserts that "[s]uch a flagrant disregard for the maintenance and location of an alleged murder weapon and other highly exculpatory evidence in a capital case should be seen as a defacto [sic] example of bad faith." But Anderson fails to explain how the items were inappropriately stored, and the only basis he offers to support his claim that the items were inappropriately stored is the fact that they have deteriorated. This argument is circular and insufficient to establish that the State or law enforcement acted in bad faith.

Even assuming that the items were inappropriately stored, "under Youngblood and this Court's precedent, the determination of bad faith does not turn on whether law enforcement officers followed established procedures. Instead, bad faith exists only when law enforcement officers intentionally destroy evidence they believe would exonerate a defendant." Guzman, 868 So. 2d at 509 (citing Youngblood, 488 U.S. at 57). However, Anderson describes the potential usefulness of the items in terms of the results of "independent forensic testing" that he claims possibly would have been done during the postconviction stage.

Therefore, in order to establish entitlement to relief under <u>Youngblood</u>, Anderson would have had to assert that law enforcement believed that independent forensic testing of the items used in obtaining Anderson's conviction would actually exonerate him in the future, and, as a result, law enforcement chose to inappropriately store the items with the intent to allow them to deteriorate so that they would not be able to be retested by Anderson in the future. This Anderson has not done. Even accepting his allegations that the items were potentially useful and inappropriately stored as true, he has not established entitlement to relief under <u>Youngblood</u>.

Because Anderson failed to sufficiently plead entitlement to relief under <u>Brady</u>, <u>Trombetta</u>, or <u>Youngblood</u>, he was not entitled to an evidentiary hearing, and the trial court did not err in summarily denying these claims.

### C. National Academy of Sciences Report

Anderson asserts that a report issued in 2009 by the National Academy of Sciences regarding the field of forensic science, titled "Strengthening Forensic Science in the United States: A Path Forward" ("2009 NAS report"), constitutes newly discovered evidence demonstrating that the scientific evidence used to convict him is unreliable. However, we have repeatedly held that the 2009 NAS report does not constitute newly discovered evidence. <u>E.g.</u>, <u>Dennis v. State</u>, 109

So. 3d 680, 700 (Fla. 2012); Johnston v. State, 27 So. 3d 11, 21 (Fla. 2010).

Accordingly, summary denial of this claim was proper.

## D. **Ring** and **Hurst**

During the pendency of Anderson's appeal from the denial of his motion for postconviction relief, the United States Supreme Court issued its decision in Hurst v. Florida, 136 S. Ct. 616 (2016), in which it held that Florida's former capital sentencing scheme violated the Sixth Amendment because it "required the judge to hold a separate hearing and determine whether sufficient aggravating circumstances existed to justify imposing the death penalty" even though "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." Hurst v. Florida, 136 S. Ct. 616, 619 (2016). On remand in Hurst, we held that

> before the trial judge may consider imposing a sentence of death, the jury in a capital case must unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt, unanimously find that the aggravating factors are sufficient to impose death, unanimously find that the aggravating factors outweigh the mitigating circumstances, and unanimously recommend a sentence of death.

Hurst v. State (Hurst), 202 So. 3d 40, 57 (Fla. 2016).

We have held that Hurst v. Florida and Hurst apply retroactively to defendants in Anderson's position, who were sentenced under Florida's former, unconstitutional capital sentencing scheme after the United States Supreme Court

decided Ring in 2002. Mosley v. State, 41 Fla. L. Weekly S629, S640, 2016 WL 7406506, at \*25 (Fla. Dec. 22, 2016). And in light of the nonunanimous jury recommendation to impose a death sentence, it cannot be said that the failure to require a unanimous verdict here was harmless. See Franklin v. State, 41 Fla. L. Weekly S573, S575, 2016 WL 6901498, at \*6 (Fla. Nov. 23, 2016) ("In light of the non-unanimous jury recommendation to impose a death sentence, we reject the State's contention that any Ring- or Hurst v. Florida-related error is harmless."). We therefore reverse Anderson's death sentence and remand for a new penalty phase.

### III. PETITION FOR WRIT OF HABEAS CORPUS

In addition to his postconviction appeal, Anderson filed a petition for a writ of habeas corpus in this Court, in which he asserts that: (1) appellate counsel was ineffective for failing to raise a claim under Giglio v. United States, 405 U.S. 150 (1972); (2) appellate counsel was ineffective for failing to challenge the trial court's decision to allow the State to proceed on a theory of felony murder in addition to premeditated murder; (3) his death sentence is unconstitutionally arbitrary as a result of the Florida Legislature's adoption of the Daubert standard in 2013; and (4) his death sentence is unconstitutional under Ring. Because we have already determined that Anderson is entitled to a new penalty phase, we decline to address Anderson's Giglio claim, which is directed at the penalty phase. Nor is

there a need to address the <u>Ring</u> claim in Anderson's habeas petition because we have determined that Anderson is entitled to relief under <u>Hurst</u>. The two remaining claims raised in the habeas petition will be addressed in turn.

## A. Felony-Murder Theory

In his direct appeal, Anderson raised a challenge to the trial court's decision to permit the State to proceed on a theory of felony murder in addition to a theory of premeditated murder. In denying relief, we explained:

> In his seventh claim, Anderson argues that the trial court erred in permitting the State to proceed on the theory of felony murder when the indictment only charged first-degree murder. The State brought up felony murder for the first time during the charge conference and Anderson argues that he was prejudiced by a lack of notice. Anderson acknowledges that this claim was decided adversely to him in <u>Knight v. State</u>, 338 So. 2d 201, 204 (Fla. 1976). <u>See also</u> <u>Kearse v. State</u>, 662 So. 2d 677, 682 (Fla. 1995). He offers no valid reason for receding from <u>Knight</u>. Hence there is no merit to this claim.

<u>Anderson</u>, 841 So. 2d at 404. Although the claim was raised and rejected previously, Anderson now contends that appellate counsel was ineffective in raising this claim because the circumstances of his case are different from the circumstances in <u>Knight</u> and appellate counsel "fail[ed] to rely upon the proper due process case law." This claim is insufficiently pleaded because Anderson has not identified the "proper due process case law" on which he claims appellate counsel was ineffective for failing to rely, and we therefore deny relief.

- 29 -

## B. <u>Daubert</u>

Anderson claims that his death sentence is unconstitutionally arbitrary in violation of <u>Furman v. Georgia</u>, 408 U.S. 238 (1972), and the Eighth Amendment to the United States Constitution. His argument revolves around the standard used to determine the admissibility of new or novel scientific evidence. In 2013, Florida adopted the federal standard governing the admissibility of scientific evidence, which was first announced by the United States Supreme Court in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), and which replaced the <u>Frye</u> standard. Ch. 2013-107, at 1461-63, Laws of Fla. Anderson argues that the scientific evidence used against him at his trial in 1999 would not have been admissible under the <u>Daubert</u> standard and because the <u>Frye</u> standard was the relevant standard at the time of his trial, his conviction is arbitrary.

This claim is without merit. What Anderson seems to argue is that because the scientific evidence admitted at his trial was admissible under <u>Frye</u> but would not have been admissible had the <u>Daubert</u> standard been the relevant standard in Florida at the time of his trial, his conviction and death sentence are arbitrary. This argument fails because the scientific evidence admitted at Anderson's trial was not subjected to a <u>Frye</u> analysis because Anderson—as he argues in his postconviction appeal as a claim of ineffective assistance of counsel—did not seek a hearing and determination of admissibility under <u>Frye</u>. Thus, because he failed to seek an

admissibility determination, the evidence would not have been subjected to a Daubert analysis either, had that been the relevant standard at that time. Additionally, we have held that the legislative adoption of the Daubert standard in 2013 does not apply retroactively. Zakrzewski v. State, 147 So. 3d 531 (Fla. 2014) (table).

Moreover, Anderson ignores the fact that we have previously recognized that the Daubert standard is more lenient in terms of admitting novel scientific evidence than Frye. See Brim v. State, 695 So. 2d 268, 271-72 (Fla. 1997) (footnote omitted) ("Despite the federal adoption of a more lenient standard in [Daubert], we have maintained the higher standard of reliability as dictated by Frye."); see also Hernandez v. State, 180 So. 3d 978, 1008 (Fla. 2015) ("[T]he Supreme Court in Daubert actually criticized Frye and its 'exclusive test' imposing a 'rigid general acceptance requirement' as being at odds with the liberal thrust of the Federal Rules and their 'general approach of relaxing the traditional barriers to opinion testimony.' " (quoting Daubert, 509 U.S. at 588-89) (some citations omitted)), cert. denied, 136 S. Ct. 2487 (2016). Thus, any suggestion that a determination of the admissibility of the State's scientific evidence would have been more favorable to Anderson under Daubert than Frye is illogical.

## IV. CONCLUSION

For the reasons stated above, we affirm the denial of postconviction relief as to Anderson's conviction and deny the petition for a writ of habeas corpus, but we vacate the death sentence and remand for a new penalty phase.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
CANADY, J., concurs in part and dissents in part with an opinion, in which POLSTON, J., concurs.
LAWSON, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

CANADY, J., concurring in part and dissenting in part.

I agree with the decision to affirm the denial of relief regarding Anderson's conviction, and I agree that Anderson's habeas petition should be denied. But I dissent from the decision to require a new penalty phase. As I have previously explained, Hurst v. Florida, 136 S. Ct. 616 (2016), should not be given retroactive effect. See Mosley v. State, 41 Fla. L. Weekly S629, S641-44, 2016 WL 7406506, at *27-32 (Fla. Dec. 22, 2016) (Canady, J., concurring in part and dissenting in part).

POLSTON, J., concurs.

An Appeal from the Circuit Court in and for Broward County,
      Michael Allen Usan, Judge - Case No. 061994CF015182A8881
And an Original Proceeding – Habeas Corpus

- 32 -

Martin J. McClain, Special Assistant Capital Collateral Regional Counsel, and Scott Gavin, Staff Attorney, Capital Collateral Regional Counsel, Southern Region, Fort Lauderdale, Florida,

    for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, Florida,

    for Appellee/Respondent